TONY A. WEBER *vs.* ANNIE HARKINS *et al.*

MAY 23, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J. This is a bill in equity to have a trust impressed upon certain funds in the possession or control of the respondent Annie Harkins, and for other relief. After hearing in the superior court on bill, answer, replication and proof, and decision thereon, a final decree was entered, granting the relief prayed for by the complainant. The cause is before us upon the respondents' appeal from such decree.

The complainant is a brother of Margaret W. Schiller, late of Providence, deceased, and he sues individually and also as administrator of her estate. The respondent Annie Harkins is a sister of the deceased and, being the only real appellant, will be hereinafter referred to as the respondent. The other respondents are the Rhode Island Hospital Trust Company and the Providence National Bank. The monies in question were in possession and control of the respondent, having been withdrawn by her, after Margaret Schiller's death, from two bank accounts which, at the time of the intestate's death, stood in the joint names of Margaret Schiller or Annie Harkins, and payable to either, or the survivor of them.

The material facts are largely undisputed although the strength of certain testimony depended upon the credibility of the witnesses. Margaret Schiller died, intestate, in Providence on June 8, 1938, leaving neither husband nor children surviving. Her heirs and next of kin included the complain-

ant, the respondent Annie Harkins, and certain nieces and nephews. At her death she left several deposits in various banking institutions in Providence and each of them stood, with one exception, in the joint names of Margaret Schiller and some one of her relatives. The bankbooks representing all of these deposits were found after her death in her safe deposit box and in her home; and, among them, were the two with which we are now concerned.

The first of these accounts was opened November 1, 1907 in the Rhode Island Hospital Trust Company by and in the name of Margaret Schiller. On February 20, 1915 the name of respondent was added and the account and bankbook then stood in the following names: "Margaret Schiller or Annie L. Harkins. Payable to either or to the survivor." At that time the amount on deposit in this account was $3,736.37; and on June 15, 1938, following the death of Margaret Schiller, the respondent as survivor withdrew the entire deposit amounting to $19,286.60. This sum was delivered to respondent's daughter and was deposited in the latter's account in Butte, Montana, where the respondent had lived for many years and was still living when the intestate died.

The second account was opened August 8, 1910 in the Merchants National Bank by and in the name of Margaret Schiller. On February 20, 1915 the name of respondent was added also to this account, so that it then stood in the joint names of "Margaret Schiller or Annie Harkins, and payable to either, or the survivor of them". At that time the monies on deposit in this account amounted to $4,123.37. On April 1, 1933, the balance of $5,693.41 was transferred to the Providence National Bank in the same names, and on June 25, 1938, following the death of Margaret W. Schiller, the respondent as survivor withdrew the entire deposit amounting to the sum of $4,252.78. This apparently was also delivered to respondent's daughter.

All of the monies in the accounts in question belonged originally to Margaret W. Schiller. She had made all of the deposits and withdrawals at various times and always had retained possession and exclusive control of these bankbooks. After the addition of the name of respondent, both accounts showed withdrawals and deposits by the intestate in varying amounts. The account in the Rhode Island Hospital Trust Company reached over $8000 in November 1928; and a withdrawal in that month reduced it to $411.38. Further, on September 8, 1929, that account showed a balance of $3419.60 and was reduced by withdrawals to $213.74 on May 22, 1931. No further withdrawals or deposits were made until April 9, 1936 when a large and last deposit was made leaving a balance of $19,090.90.

The evidence further shows that when respondent's name was added to these accounts, she was not present but signature cards were mailed to her by Margaret Schiller and, upon their signature by respondent, they were returned to Margaret Schiller who filed each of them at the proper bank. The respondent's name was also added in the summer of 1936 to Margaret Schiller's safe deposit box in the Rhode Island Hospital Trust Company; but the key was always kept and the box controlled solely by Margaret Schiller.

The complainant testified to a statement made to him by the respondent as follows: "She (respondent) had access to the box and in the event that my sister Margaret would die not to wait to take a train but to take an airplane and come to Providence. And she (respondent) having access to the safe deposit box in there she would find books made out in joint names to whom she wanted those books to be delivered to." He further testified that the respondent also told him that such distribution of the bankbooks was to be made "directly after her (intestate's) death."

The respondent testified that: "She (intestate) said she wanted my name in case of her death—she wanted my name

on her safe deposit box and said if she took sick I shouldn't wait for a train, I should take an airplane and come." She also testified that the intestate had said, within the hearing of both herself and Mrs. Speich, a niece: " 'If anything happens', she said to me 'be sure', she said, 'that you look in every little hole and corner because I have a habit of tying up money and jewelry and little things and hiding them.' And she said, 'be sure you two girls look everywhere.' "

The respondent further testified that, in 1925 or 1926, when the intestate was visiting in Butte, Montana, she said one day when they were going down street: " 'Why don't you give up boarders? I have given you plenty' she says, 'You don't have to work any more.' " Moreover, according to respondent's testimony, when she was visiting the intestate in Providence during June 1936, the latter stated: " 'Why don't you stay, give up your work and stay with me?' she said, 'I have given you plenty and you look so tired all the time and you won't have to work any more' ". During this same visit, when the presence of a calendar of the Rhode Island Hospital Trust Company suggested that respondent had also received one, as respondent testified, the intestate said: " 'I have an account for you, you and I together, and that is why they sent you the calendar.' " The respondent admitted, however, that neither she nor the intestate ever mentioned the alleged gifts or accounts in any of the letters between them which she stated were exchanged almost weekly for a number of years.

One of the bankbooks in question was found in the safe deposit box, which was not opened until the key had been found in the intestate's bedroom; and the other was found, together with several of the other bankbooks above referred to, in a yarn bag in the intestate's home after her death. The respondent never personally exercised or attempted to exercise any right of deposit or withdrawal or control over either of the bank deposits or bankbooks during the intestate's

life. At no time was any specific account or amount of the alleged gift mentioned by the intestate; and the amounts in these accounts were not known by respondent until the books were discovered after the intestate's death.

There was evidence to the effect that the intestate had consulted a lawyer concerning the making of a will and had considered that "she might make a will" and possibly undo what she had done in connection with the joint bank accounts. There was some further evidence, apparently not contradicted, that she was apprehensive about subjecting her estate to the costs required to make and probate a will. Part of the respondent's testimony was corroborated by certain witnesses; and part of the complainant's testimony was similarly corroborated by others. Apparently there is agreement that the intestate was secretive and kept details of her business and financial affairs to herself.

The trial justice found, in part, that the intestate "by exercising exclusive control of the accounts, by retaining the right exclusively to make deposits and withdrawals thereof, by declarations of intestate regarding her intention and by all the attendant circumstances, the intestate did not intend to create in herself and Mrs. Harkins a joint control of said funds with the attendant right of survivorship *in praesenti* and thus divest herself of the exclusive control of the moneys so deposited but that intestate had in mind at the time the retention of exclusive control of said funds during her lifetime and that they should become the property of Mrs. Harkins only upon her decease."

The respondent, in substance, contends, if we understand correctly, that the trial justice in rendering his decision misconceived the law and material evidence as appears in the rescript. We have examined the evidence and rescript, in connection with these contentions, and we are of the opinion that the respondent misinterprets the rescript and the rea-

soning of the trial justice. The trial justice did not hold or consider, as respondent contends, that the mere retaining of possession of the bankbook by the intestate was *conclusive* evidence of her lack of present donative intent; and he did not ignore the form of the joint survivorship accounts as being some evidence of the existence of such intent. A fair reading of the rescript leads to the conclusion that the trial justice considered each of these facts with all of the other evidence and attendant circumstances in determining the presence or absence of a donative intent *in praesenti* and a completed gift *inter vivos*. Nor can we find that he clearly misconceived important evidence, as contended.

The burden of establishing a gift *inter vivos* is upon a claimant; and he must establish that the donor intended, *in praesenti*, to divest himself of the exclusive ownership and control over the subject-matter of the alleged gift and to vest such ownership and control jointly in the claimant. *Woonsocket Institution for Savings* v. *Heffernan,* 20 R. I. 308; *Raferty* v. *Reilly,* 41 R. I. 47; *Peoples Savings Bank* v. *Rynn,* 57 R. I. 411. The trial justice found substantially that the respondent did not sustain such burden and we cannot say that he was clearly wrong.

In the instant cause the best evidence for the respondent is somewhat vague and not related to any specific account or amount or gift. The intestate's language was at least open to a different interpretation from that contended for by the respondent. In our opinion, the conduct of the parties, in connection with all of the other pertinent evidence and attendant circumstances, shows that the intestate had attempted, by means of these joint survivorship accounts, to make a testamentary disposition of them to the respondent to become effective on the intestate's death. Such an intention and disposition does not establish a donative intent *in praesenti* and a completed gift *inter vivos*.

For the reasons stated, the respondent's appeal is denied, the decree appealed from is affirmed and the cause is remanded to the superior court for further proceedings.

*Charles A. Curran, Daniel A. Colton,* for complainant.

*Hartigan, Mullen & Roberts,* for respondent Annie Harkins.