324 A.2d 648.

CLAIRE M. SARNI *vs.* N. ROBERT MELOCCARO, *as President and Treasurer of Garden City Builders, Inc.,* and SUSIE MELOCCARO, *as Secretary of Garden City Builders, Inc.*

AUGUST 14, 1974.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is the second time that we are presented with an appeal arising out of a civil action instituted by Claire M. Sarni (Claire) against her brother, N. Robert Meloccaro (Robert), and her mother, Susie

Meloccaro (mother), in their respective capacities as president and treasurer and as secretary of Garden City Builders, Inc., a family corporation, to order an inspection of the corporate records and books.

Initially, an extensive hearing was held before the Presiding Justice of the Superior Court. The sole question considered at that time was that of Claire's status as a stockholder in the corporation. A decision was rendered in favor of plaintiff, a "supplementary order" was entered, and the matter was continued for further proceedings relating to the relief sought by Claire. The defendants, however, appealed from that order, and in *Sarni* v. *Meloccaro,* 110 R. I. 566, 294 A.2d 844 (1972), we held that, since it was evident that other questions remained to be resolved in the trial court, we would not review the case "piecemeal" and would await the resolution of those issues and the entry of a judgment which would embody a complete and final adjudication of all the rights and liabilities of the parties. Hence, their appeal was denied.

Subsequently, another hearing was held before that same trial justice, and such a complete judgment has been entered. Claire prevailed. However, Robert and the mother once again appealed to this court.

In the first hearing, the Presiding Justice heard testimony relating solely to the issue of whether Claire was or was not a stockholder in the corporation. She claimed ownership of 18 shares of Garden City Builders, Inc. stock as the result of an alleged gift to her from her father, Nazzareno Meloccaro (father), one of the founders of the business. He died in 1955. It was necessary to determine whether the stock in fact had been given to Claire in order to decide whether she had any right to seek inspection of the corporate records.

The evidence presented at the hearing was in part testimonial and in part documentary.

During the years 1952-54 Claire was living away from home while attending the University of Rhode Island. The relationship between father and daughter was described as a "close relationship," as evidenced by Claire's returning home every weekend and by calling her father every Wednesday night. She testified that after her Christmas vacation during the winter of 1952-53, she was at home on a weekend or vacation. On one occasion, while she was in the family room of the house, her father joined her there. He was holding two stock certificates representing shares in the family business. He handed her the two certificates, which contained his signature in two places, and told her that "[h]e was dividing up his estate and that he was giving me stock in the Garden City Builders." One certificate was for ten shares, the other represented eight. She testified that she examined the certificates and then gave them back to her father, asking that he hold them for her.

Claire stated that she did not see the stock again until 1960, when she found the certificates in a drawer in her mother's desk while searching for stationery in order to type out some bills for her husband, Robert P. Sarni, who, at that time, was initially engaged in the practice of medicine. She recognized the certificates as the ones handed to her by her father during her collegiate days. She showed them to her husband. The certificates were then returned to the drawer.

Claire also testified that over a period of years she received money from the corporation on a weekly basis until 1965, although she rendered no services for the business.

The testimony of other witnesses included that of the mother. She testified that she really didn't have any knowledge about the transfer of stock, that her husband never discussed this with her, and that he never gave her

any stock in Claire's name to put in the desk, nor did she ever see any stock in the drawers. The eldest daughter, Eleanor DeAngelis, who was in charge of the business office, said she never saw any stock certificates bearing the names of herself or her brother or her sisters. Robert took the stand and related essentially the same testimony, and added that although Claire did draw $50 a week as salary for about eight years after her marriage, this money was not incidental to any stock ownership. He never saw any stock which had been issued to Claire or to any of the other children.

The accountant for the father and the corporation testified that he had certain discussions with Nazzareno regarding the tax advantages of making gifts of stock to the children, and that the father told him that he would think over the matter. The discussions took place three or four years before the father died. The accountant personally did not know whether or not the gifts were ever made.

Defense counsel then took the stand and testified in narrative form. He was personal counsel to the father for many years and a friend of the Meloccaro family. He related that sometime in the latter part of 1952 or early 1953, the father mentioned to him that he had been thinking about making gifts of stock to his children. He eventually requested the attorney to prepare eight certificates for his children. They were so prepared and handed to the father unsigned. He was to let counsel know what he was going to do. The attorney never heard about them again.

At the time of the father's death, none of the certificates, including those representing the father's ownership, could be found. Counsel advised the family that new certificates should be prepared and issued, including two for 18 shares

to Claire, bearing the legend "* * * which said [original] certificates have either been lost, misplaced or not originally delivered."

The documentary evidence included the stock stubs of the corporation's stock certificate book, which reflected the ownership of 128 shares in the father and the ownership by each of the four children[1] of 18 shares made up of two certificates, one for ten and one for eight shares. There were outstanding only 200 shares of stock.

The mother, as executrix of her husband's estate, and her counsel and accountant filed inventories with the Probate Court and tax returns with the state and the Federal Governments, all reflecting ownership in the father as of the date of his death of 128 shares, and a previous transfer to each of his four children of 18 shares of stock. These documents were executed under oath. Taxes were paid and the estate probated on these facts.

After consideration of all the above-mentioned testimony, the trial justice found that Claire has been, since the date shown on the corporate records, the owner of 18 shares of stock in Garden City Builders, Inc. The defendants disagree with this ruling.

As we proceed to consider this appeal, we shall be guided by our well-settled rule that findings of fact made by the trial justice are entitled to great weight by the reviewing court and will not be disturbed unless they are clearly wrong.

Parenthetically, we also note that defendants' initial ground for appeal is premised upon the theory that the procedure invoked by Claire in commencing this litigation, *i.e.*, petition for writ of mandamus, is an improper

---

[1]Nazzareno and Susie Meloccaro were the parents of four children— Eleanor, Robert, Claire and Susan. The stubs indicate a transfer by the father of ten shares to each child on December 31, 1952, and another transfer to each child of an additional eight shares on January 5, 1953.

vehicle for seeking relief due to the fact that a preliminary issue, her status as stockholder, had yet to be resolved. The defendants cite cases which hold that mandamus lies only where petitioner has a "clear legal right to have the act done." The argument proceeds that since Claire's status was in doubt, mandamus does not lie. Our brief response to that argument is that we are no longer in the days when common-law pleading was in full flower. We look to substance, not labels. Concededly, Claire in her complaint "demands that this Court issue a Writ of Mandamus." However, after examining the complaint in its entirety, it seeks nothing more than affirmative equitable relief and we will treat it accordingly. We are governed by our more liberal rules of civil procedure which "* * * shall be construed to secure the just, speedy, and inexpensive determination of every action." Super. R. Civ. P. 1. Accordingly, Claire's complaint falls within the ambit of this provision. *See Demers* v. *Adamson,* 102 R. I. 453, 231 A.2d 484 (1967).

Claire, if she is to sustain her claim of a gift of stock, must demonstrate a present true donative intent on the part of the donor, her father, together with some manifestation such as his actually or symbolically delivering the stock so as to completely divest himself of its dominion and control. *Black* v. *Wiesner,* 112 R. I. 261, 308 A.2d 511 (1973); *Chase* v. *Blackstone Distributing Co.,* 110 R. I. 537, 294 A.2d 392 (1972); *Wyatt* v. *Moran,* 81 R. I. 399, 103 A.2d 801 (1954); *Carr* v. *MacDonald,* 70 R. I. 65, 37 A.2d 158 (1944); *Weber* v. *Harkins,* 65 R. I. 53, 13 A.2d 380 (1940); *see also Talbot* v. *Talbot,* 32 R. I. 72, 78 A. 535 (1911).

The defendants argue that Claire has failed to establish a gift by the requisite proof. They place great emphasis on the fact that the only testimony bearing upon the existence of the alleged gift is the "bare statement" of

plaintiff herself that the gift was made. The record does not support defendants' contention.

The trial justice did not have merely unsupported testimony of Claire and her husband before him. The documentary evidence, including stock stubs, state and federal tax returns and the probate court inventory, all of which were prepared many years prior to the time the members of the Meloccaro family found themselves enmeshed in litigation, gives mute and objective support to Claire's claim.

Taking all the circumstances into account, and the corroborative events above enumerated, we see no basis upon which to find that the Presiding Justice's assessment of the facts before him was "clearly wrong." Credibility was an important factor in reaching his decision. The court, after specifically referring to the documents executed in the fifties, believed Claire's testimony and considered it unimpeached by defendants' witnesses. When so viewed, there is in the record "clear and convincing" evidence that a delivery of the 18 shares was actually made. The trial justice so found and we see no reason to disturb his finding.

The defendants also contend that Claire's claim of ownership should be defeated by the equitable doctrine of laches. The argument presented is that since she really made no claim on the stocks from 1952 or 1953 until 1965, and made no claim against the father's estate for her shares, she "sat on her rights" and delayed too long in bringing her action. We see no merit in such argument. Claire made no demand for her stock until 1965. She made the demand at that time because the weekly payments to her had been stopped. She commenced this litigation in February 1966. Clearly, there is no unreasonable delay involved here. Obviously, she did not become aware of any claim against her ownership until her 1965 demand,

and there was no reason to file any claim against her father's estate because she believed she owned the stock. Also, had she been allowed at any time to see the corporation's stock book, she would have found herself listed as the holder of two certificates. There was no showing of laches.

In *Sarni* v. *Meloccaro, supra,* we stated that in the absence of some statutory right[2] or provision in the charter or bylaws, the inspection of corporate records has been described as a privilege afforded to a stockholder which becomes a right only upon a showing that the inspection will be made at "proper times" and for "proper purposes," citing *Lyon* v. *American Screw Co.,* 16 R. I. 472, 17 A. 61 (1889), and *Landin* v. *Carlson,* 55 R. I. 18, 177 A. 143 (1935). The plaintiff had not yet satisfied either of those elements.

At the hearing after the decision in the first case, plaintiff's attorney attempted to fill the void. Only one witness, Robert, testified before the court. He related that both annual meetings and special meetings were held by the corporation, but that Claire was never given an opportunity to participate in such, because she was never given any notice to attend. She also was never provided with any financial information with reference to Garden City Builders, Inc. The whole thrust of the testimony adduced by plaintiff's counsel on direct examination of this witness was that Claire has been denied any and all information as to the affairs of the corporation. The court believed that this was sufficient evidence upon which to establish a proper basis for inquiring into the financial

---

[2] When this litigation was begun in February 1966, a stockholder had no statutory right to inspect corporate records. The right was granted in 1969 with the enactment of the Rhode Island Business Corporation Act, ch. 1.1 of title 7.

affairs of the corporation in order to determine whether her interests therein had been properly managed.

Since the stockholders are, in a sense, the beneficial owners of the corporate assets, and thus the persons primarily interested in seeing that the corporation is efficiently and profitably managed, it is generally held that they are entitled to inspect books and records in order to investigate the conduct of management, to determine the financial condition of the corporation, and generally to seek an account of the stewardship of the officers and directors. *See* Annot., 15 A.L.R.2d 11 et seq. (1951); Annot., 22 A.L.R. 19 et seq. (1923).

In *Guthrie* v. *Harkness*, 199 U. S. 148, 154-55, 26 S.Ct. 4, 6, 50 L.Ed. 130, 132 (1905), the Supreme Court stated, in citing *Huylar* v. *Cragin Cattle Co.*, 40 N.J.Eq. 392, 398 (1885), that:

> " 'Stockholders are entitled to inspect the books of the company for proper purposes at proper times. . . . And they are entitled to such inspection, though their only object is to ascertain whether their affairs have been properly conducted by the directors or managers. Such a right is necessary to their protection. To say that they have the right, but that it can be enforced only when they have ascertained, in some way without the books, that their affairs have been mismanaged, or that their interests are in danger, is practically to deny the right in the majority of cases.' "

Claire had received weekly payments from the corporate till until 1965 when they suddenly stopped. That fact, plus the admissions by Robert that she had in essence been deprived of any information concerning the management of the corporation, supports her allegation in her complaint that she cannot "pass in any way upon the administration of the Corporation" and thereby establishes a "proper purpose" in terms of the *Guthrie* considerations for which the right of inspection is enforceable. There is no suggestion

by defendants that plaintiff was acting in bad faith or from improper motives. We believe a proper purpose has been established.

As to the "proper time," what is mandated is merely a reasonable time. In her complaint, Claire asks the court to set a reasonable time for inspection. In his decision, the Presiding Justice required that plaintiff be shown the records at a reasonable business hour to be selected by the parties. If no agreement to time were reached, the court would make the determination. We need not overextend this opinion by discussing that aspect of the case any further.

Another contention made by defendants is that the trial justice erred in certain of his rulings on the admission and rejection of evidence during the course of the hearing. We need only say that the rulings of the court were clearly correct in that plaintiff's objections to the questions posed by defendants were proper because the information sought was either irrelevant and immaterial to the proceedings at bar or the answers given were nonresponsive to the questions posed by defense. In the final instance, plaintiff's counsel asked a question, the answer to which constituted mere repetition to testimony previously elicited. The witness was allowed to answer the question over defendants' objection, but the trial justice noted that the answer added nothing to the record. There was no error.

Finally, we come to defendants' contention that the doctrine of indispensable party is applicable to this controversy. They argue that although the mother, as secretary of the corporation, was named as a party defendant, she has not been named as an individual defendant. They point out that the father bequeathed all his stock in Garden City Builders, Inc. to his wife. Consequently, they claim that Claire's failure to join her mother in this liti-

gation as an individual as well as her corporate capacity is fatal. We think otherwise.

It appears that for the purpose of trying her title to the stock in terms of having the right of inspection granted to her, Claire has joined all the necessary parties. The mother, in testifying at the hearing, gave no indication that she was contesting the ownership of the stock in regard to any resulting diminution of her inheritance under her husband's will. We believe that the mother's participation in this litigation triggers the application of the doctrine of collateral estoppel so as to preclude her from attempting to relitigate the issue of the ownership of the stock. *See Providence Teachers Union, Local 958 v. Mc-Govern*, 113 R. I. 169, 319 A.2d 358 (1974).

The defendants' appeal is denied and dismissed.

*Abedon, Michaelson, Stanzler & Biener, Julius C. Michaelson, Richard A. Skolnik*, for plaintiff.

*Aram A. Arabian*, for defendants.