397 A.2d 68.

RALPH FARGNOLI, JR., *et al. vs.*
VINCENT A. CIANCI, JR., MAYOR, *et al.*

JANUARY 22, 1979.

PRESENT: Joslin, Kelleher and Doris, JJ.

154

KELLEHER, J.   As will be seen, this is a petition in equity in the nature of quo warranto, in which we are acting pursuant to the provisions of G.L. 1956 (1969 Reenactment) §10-14-1. This opinion supplements an order entered in this court on

August 9, 1978, in which we (1) vacated on jurisdictional grounds a July 28, 1978, judgment of the Superior Court which had upheld the Providence City Council's July 12, 1978, confirmation of some twenty-eight mayoral appointments to various municipal boards and commissions and (2) ruled that certain individuals, specifically, Nancy Derrig (Derrig), John Sheehan (Sheehan), and James McManus (McManus) still retain their respective offices as member of the Board of Park Commissioners, Chairman of the Board of Licenses, and member of the Tax Assessment Board of Review, despite an attempt by the mayor and certain members of the council to replace them with the appointments of Carmine A. Bucci (Bucci), Raymond Dettore, Jr. (Dettore), and George T. Smith, Jr. (Smith).

In order that this dispute may be placed in its proper perspective, we shall first relate what took place at the July 12 meeting. We shall then discuss the Superior Court's jurisdiction and conclude by setting forth the rationale for that part of our August 9, 1978 order which bars Bucci, Dettore, and Smith from exercising any of the powers supposedly bestowed upon them in July 1978.

Evidence adduced in the Superior Court indicates that at the conclusion of its regular July 6, 1978, meeting the council adjourned "to meet again at the Call of the Chair." On July 10 the chair ordered the city clerk to call a meeting of the city council for Wednesday, July 12, at 3 p.m. The call indicated that the council at its meeting would consider a proposed ordinance which would freeze the city's tax rate at the previous year's level. When the meeting of July 12 was called to order, twenty of the twenty-four qualified council members were present.[1] The council recited the Pledge of

---

[1]The Providence City Council normally consists of twenty-six members. However, on July 12 there were only twenty-four qualified members. Pursuant to the Providence City Charter, ch. 3, §3.8, two members had forfeited their positions on the council. The pertinent portion of that section directs that "[i]f any member of the council * * * is convicted of a felony, or of any other crime not a felony but involving moral turpitude, he shall immediately forfeit his office." P.L. 1940, ch. 832, §14.

Allegiance, and from that point on, divisibility, rather than indivisibility, was the order of the day.

Following the Pledge of Allegiance, the council adopted a motion requiring a roll-call vote on any motion to adjourn or recess the evening's meeting. The council then passed, by a roll-call vote of eleven to nine, a motion pursuant to council Rule 16 to consider business other than that on the prepared docket.[2] Councilman Sanford H. Gorodetsky (Gorodetsky) thereupon moved that a communication from the mayor appointing Ronald H. Glantz (Glantz) as city solicitor be approved. This motion was seconded but was not put to a vote at this time. Another council member, Edward W. Xavier (Xavier), immediately moved that the appointment be referred to the Committee on Employee Relations. Again, this motion was seconded but never put to a vote.

After the referral motion, oratory took over as charges and countercharges filled the air. After some concern had been expressed about the suddenness of the submission of the Glantz appointment, Councilman Thomas W. Pearlman (Pearlman) reminded his colleagues that "it was the policy of the majority of this Council up until now to reject every appointment of the Mayor" and "I think some of the Council-men are finally fed up with the obstructionist attitude by those who were in the majority preventing the Mayor from running the City Government in accordance with the Charter."[3] Councilman Robert F. Lynch (Lynch) had no doubt about the "rationale for the timing" as he observed that "[a]pparently Mayor Cianci or Mr. Glantz or the two of them realized or found out that three of the Regular

---

[2]City council Rule 15 provides in part:

"No Ordinance, Resolution, Order, Report or other business shall be considered as having been introduced unless notice of same shall have been filed with the City Clerk as herein provided, and said Ordinance, Resolution, Order, Report or other business appears on the prepared docket, or unless the Council, by a majority of those present, shall allow the introduction of such from the floor without it appearing on the printed docket."

[3]In reporting the remarks made at the July 12, 1978, meeting, we are using the verbatim quotes as they appear either in the clerk's minutes or in her tape recording.

Democrats on this Council are hospitalized at the present time and perhaps thought this was an opportune time for him to present this appointment to the council, and I think it's a shoddy trick." After Councilman John P. Garan (Garan) had taken issue with the obstructionist charges made by Pearlman, Xavier moved that "we stand at ease." Again, this motion was seconded but never put to a vote.

After Xavier's motion was seconded, nine council members walked out of the meeting. Sometime thereafter Council President Pro Tempore Ralph R. Fargnoli (Fargnoli) reentered the council chamber, assumed the podium, and directed the clerk to call the roll. The clerk called the roll. She marked ten members as being present, twelve as absent, and recorded two as not responding. The two nonresponders, Gorodetsky and Councilman Charles R. Mansolillo, were present, but they refused to answer because they believed that the chair's order violated the roll-call motion which had been introduced at the beginning of the meeting. Once the tally was announced, Fargnoli declared the meeting to be adjourned and departed. The eleven remaining members proceeded to elect Pearlman as acting president pro tempore, and once this was accomplished, they approved the appointment of Glantz as city solicitor. After questioning the existence of a quorum, the city clerk left the meeting. Although there is no record of the minutes subsequent to the clerk's departure, apparently the remaining eleven members unanimously approved all of the appointments submitted by the mayor to the council and rejected the tax-freeze proposal.

Within a matter of days, six individuals filed in the Superior Court a multicount complaint labeled "class action for injunctive relief." Three of the plaintiffs were Fargnoli, Lynch, and Councilwoman Carolyn A. Brassil (Brassil). The other three were the incumbent officeholders, Derrig, Sheehan, and McManus, who in the class-action phase of this complaint alleged that they were suing as individuals and as representatives of the class of persons allegedly removed as a result of the action taken by the city council. The defendants were Mayor Vincent A. Cianci, City Treasurer Donald

McKiernan, and four of the mayor's appointees, Glantz, Bucci, Dettore, and Smith. These four appointees were sued individually and as representatives of the class of all persons who were purportedly appointed.

On July 19 an order was entered in the Superior Court which, in effect, enjoined all municipal boards and commissions to which appointments had been made from carrying on any business. A hearing on plaintiffs' complaint began before a justice of the Superior Court on July 18 and ended 2 days later. Subsequently, on July 28, the trial justice ruled that the July 12 appointments were lawful and ordered that judgment be entered for defendants. The judgment which carried out the pertinent portions of the trial justice's bench decision indicates that the trial justice treated plaintiffs' complaint as a "class action" and recognized that the relief being sought was "in the nature of quo warranto and of general injunctive relief."

On the same day, plaintiffs filed their appeal to this court and sought a stay of the Superior Court's judgment. In due course a stay order was issued, memoranda in behalf of the named litigants were filed, and oral argument was held on August 4. Subsequently, we issued our August 9 order wherein we vacated the July 28 judgment and treated so much of the complaint as related to Derrig, Sheehan, and McManus' claim to retain their offices as being a petition in equity in the nature of quo warranto in which the respondents were Bucci, Dettore, and Smith.

Our preargument examination of the Superior Court record proved to be most informative. While the mayor, the city treasurer, and the four named defendant appointees were represented by counsel at the Superior Court hearing, no legal process had ever been prepared and served on anyone. The trial justice made it clear that he was considering the controversy on its merits. Assuming that the class-action provisions of the Superior Court Rules of Civil Procedure apply to a quo warranto proceeding, no effort was made to give notice of the pendency of the suit to any members of the

class, either plaintiffs or defendants, and no inquiry was initiated as to whether the named defendants were true representatives of the class. For instance, prior to July 12 Glantz had been the acting city solicitor. Glantz was in an "acting" status because his predecessor's term had expired, and the mayor's pre-July 12 efforts to have Glantz's appointment approved by the council were unsuccessful. In other words, Glantz in no way could be classified as a replacement for an incumbent officeholder, and what is said of Glantz would be said of several other appointees. Incidentally, some of the mayor's appointments were to fill vacancies caused by death. Another appointment was actually a reappointment of the incumbent of the Bureau of Licenses.

At the beginning of oral argument, we asked counsel (1) what was the proper proceeding by which a private individual who was allegedly ousted from office could determine his or her right to that particular office, (2) what is the proper forum to consider such a proceeding, and (3) who are the proper parties to such a proceeding. As the colloquy ensued between counsel and the court, it became obvious that the plaintiff council members had no standing because of a lack of aggrievement. It also was quite evident that the mayor, the city treasurer, and the defendant Glantz were not proper parties to the suit because at no time did they claim title to any of the offices held by the remaining three plaintiffs.[4] In essence, the sole issue to be resolved was whether any of the remaining three plaintiffs had a superior right and title to the positions they held prior to the July 12 meeting.

As we turn to the specific jurisdictional question which caused us to vacate the judgment entered in the Superior Court, we would point out that our statute speaks of three types of quo warranto proceedings. They are quo warranto, an information in the nature of quo warranto, and a petition in equity in the nature of quo warranto. Section 10-14-2.

---

[4]Midway through the Superior Court hearing, Councilman John P. Garan's motion to intervene as a plaintiff was granted. What was said about the original three plaintiff council members applied equally as well to the intervenor.

A quo warranto writ, or an information in the nature of quo warranto, is a common law remedy or proceeding whereby the state directs an individual to show by what warrant he holds public office and to oust him from its enjoyment if the claim is not well founded. The writ became obsolete in England before our Revolution. *Attorney General* v. *Sullivan,* 163 Mass. 446, 449, 40 N.E. 843, 845 (1895); 2 Spelling, *Extraordinary Relief* at 1435 (1893). The writ was a civil remedy and issued out of chancery as a matter of course in favor of the crown. The writ fell into disuse and was replaced by an information in the nature of quo warranto, a change attributed by Blackstone to the length of a quo warranto proceeding and the finality and conclusiveness of its judgment, even against the crown. With the passage of the Statute of Anne in 1711, 9 Anne, ch. 20, an information proceeding took on criminal overtones because a judgment could be entered calling for the imposition of a fine and loss of office. *Meehan* v. *Bachelder,* 73 N.H. 113, 114, 59 A. 620 (1904). The information could be used in all instances where the ancient writ could have been maintained, and in the absence of legislation the information's application in this country has been restricted to those cases where the writ would have been granted at common law. High, *Extraordinary Legal Remedies* at 552 (3d ed. 1896).

So far as we can determine, since the adoption of the Rhode Island Constitution in 1842, the ancient writ has never been issued in this jurisdiction, litigants having sought relief by way of an information in the nature of quo warranto. In *State* v. *Brown,* 5 R.I. 1, 7 (1857), Chief Justice Ames observed that the writ and the information performed the same function. There the information was filed by the attorney general, and it asked that the defendant be ordered to explain by what authority he held the rank of major general in the Rhode Island militia. A judgment of ouster was entered against the defendant, and a nominal fine of 10¢ was imposed upon him. Later in *State* v. *Kearn,* 17 R.I. 391, 401, 22 A. 1018, 1020 (1891), the court alluded to Brown's 10¢ fine and pointed out that the Statute of Anne had never been

162

considered as being part of Rhode Island's common law.[5] The court in *Kearn* also remarked that an information in the nature of quo warranto had lost all its character as a criminal proceeding in everything but form. *Id.* at 401, 22 A. at 1020.

Any proceeding upon a writ of quo warranto or by way of an information in the nature of quo warranto which seeks to enforce a public right cannot be brought in this jurisdiction unless it is instituted by the attorney general or the attorney general intervenes in the proceeding, and the relief it affords is limited to the ouster of the incumbent from office. *See State* v. *Kearn*, 17 R.I. 391, 396-97, 22 A. 1020 (1891); *State* v. *Lane*, 16 R.I. 620, 622, 626, 18 A. 1035, 1036-37 (1889); *State* v. *Brown*, 4 R.I. 1, 5-7 (1857). Jurisdiction to hear any proceeding upon a writ of quo warranto or by way of an information in the nature of quo warranto is vested in the Superior Court by virtue of the provisions of §8-2-16. On the other hand, we have repeatedly stressed that a petition in equity in the nature of quo warranto is a statutory proceeding which stands on a completely different basis. Due to legislation enacted by the General Assembly in 1891, authorizing the use of a petition in equity in the nature of quo warranto, there is no necessity for the intervention of the attorney general because such a proceeding may be instituted by one who claims title to the office. A successful petitioner obtains a decree which not only ousts the respondent from office but also declares that the petitioner is the rightful holder of the office in dispute. *Andrews* v. *Stiles*, 99 R.I. 546, 548, 209 A.2d 210, 211 (1965); *Black* v. *Cummings*, 62 R.I. 361, 364, 5 A.2d 858, 859 (1939); *McGroarty* v. *Ferretti*, 56 R.I. 152, 154, 184 A. 508, 509 (1936). Section 10-14-1 vests the exclusive jurisdiction to entertain petitions in equity in the nature of quo warranto in this court.

Applying the principles to which we have just alluded to

---

[5]We confirm this fact by examining 5 Rhode Island Colonial Records 1741-1756 at 289. Our examination reveals that although many acts of Parliament became part of our common law by their adoption by the General Assembly in 1750, 9 Anne Ch. 20, is not among them. *See Williamson* v. *General Finance Corp.*, 99 R.I. 626, 628, 210 A.2d 61, 63 (1965).

the class-action phase of Derrig, Sheehan, and McManus' complaint, we find it obvious that they were actually attempting to enforce a public right without seeking the assistance of the sole proper party in such a proceeding, the attorney general. The other portion of their complaint, which sought a judicial confirmation of their right to return to the positions they held in Providence's officialdom prior to the July 12 walkout, could not be adjudicated in the Superior Court. Accordingly, the trial justice had no jurisdiction to do what he did on July 28. There was no doubt that Derrig, Sheehan, and McManus were seeking both the ouster of their supposed successors and the confirmation of their right and title to the offices in question. Thus, a petition in equity in the nature of quo warranto was the sole source of relief available to this trio.

Being acutely aware of the public demand that Providence's municipal paralysis be cured in the expeditious manner, we decided to fashion our own writ by considering so much of the Superior Court complaint as it pertained to Derrig's, Sheehan's, and McManus' personal claims to public office as a petition in equity in the nature of quo warranto filed in this court pursuant to §10-14-1 and base our ultimate findings on the evidence adduced at the Superior Court hearing.[6]

---

[6]When we first revealed the jurisdictional issue, the parties were offered an opportunity by which they would be allowed 2 weeks to brief the issue. However, there was a unanimous sentiment that we extricate the controversy from what was unquestionably a procedural quagmire and resolve the conflicting claims. Counsel for the plaintiffs then moved that we consider that part of the complaint which dealt with the personal claims of Derrig, Sheehan, and McManus as a petition in equity in the nature of quo warranto. Glantz, who had entered an appearance for Bucci, Dettore, and Smith, offered no objection to the motion. Later, however, as the deficiencies of the Superior Court proceeding continued to surface, Glantz did comment that since Derrig, Sheehan, and McManus were responsible for the quagmire, we should, in a manner of speaking, let the trio stew in its own juice. Dettore is a member of the Rhode Island bar and entered a "pro se" appearance in the courtroom, engaged in discussions with Glantz, and at no time offered any objection to what was transpiring.

At one point during the exchange of views, the suggestion was made that we consider the plaintiffs' complaint as being a civil action in which equitable relief was being sought. While in *Sarni* v. *Meloccaro*, 113 R.I. 630, 324 A.2d 648 (1974),

So far as the merits of this controversy are concerned, petitioners have consistently maintained that the appointments of Bucci, Dettore, and Smith are null and void because at the time the appointments were approved by the city council, there was not a quorum present.

The Providence City Charter (the charter) grants the council power to establish rules to regulate its proceedings. Chapter 3, §3.13(b). Pursuant to this delegation, the council has adopted a set of procedural rules for the ensuing term 1975-79. To the extent these rules are not applicable, the charter indicates that Robert's Rules of Order (Robert's Rules) and the common law are to govern. Chapter 3, §3.13(b). Robert's Rules provide that

> "a quorum * * * is the number of members entitled to vote who must be present in order that business can be legally transacted." Robert's Rules, ch. XI, §39 at 293.

Council Rule 5 states, in part, that

> "[a] majority of all members of the City Council shall constitute a quorum" and that "[a] less number of members of the City Council than a quorum may adjourn from time to time and compel the attendance of absent members * * *."

Rule 5 merely reiterates ch. 3, §§3.13(a) and 3.14, of the charter and is the only council rule which addresses the concept of quorum. A "member" is defined by Robert's Rules as

> "a person having the right to full participation in its proceedings." Robert's Rules, ch. I, §1 at 2.

Accordingly, on July 12, 1978, there were twenty-four

we took such an approach in a "mandamus" action involving a dispute concerning. the plaintiff's right to inspect corporate records, this court has made it clear on innumerable occasions that title to public office should not be put in question any time an individual sees fit to cast a cloud. Proceedings by way of quo warranto or informations in the nature of quo warranto must be placed in public and responsible hands. The moving party on such occasions is the attorney general. *See Black* v. *Cummings*, 62 R.I. 361, 367, 5 A.2d 858, 860-61 (1939).

qualified "members" of the Providence City Council.[7] Therefore, in order to legitimately transact business, other than to adjourn or compel the attendance of absentees, a quorum of thirteen members was required. The legality of the appointments of Bucci, Dettore and Smith rests upon whether there were thirteen members present at the time the city council approved those appointments. We believe the evidence clearly indicates the absence of a quorum.

Section 4.7(b) of the charter, in its relevant parts, states that the clerk "shall" act as the council's clerk, "shall" attend all council meetings, and "shall" keep a journal of the acts and proceedings thereof. The clerk's minutes indicate that after completion of the roll call, which indicated the absence of a quorum, Gorodetsky addressed the departing Fargnoli and said: "[T]he meeting will go on without you, did you hear what I said, the meeting will go on without you and without the rest of the Council too." Later, Pearlman, after assuming the chair as "acting president" of the council, expressed concern about the members who had left the meeting but was advised by John Rotondi, the assistant city solicitor: "You may proceed with this meeting. There was a quorum at the outset, and that quorum is sufficient for us to continue with all matters before the city." Later, when the acting president asked about the legality of the Fargnoli adjournment, the solicitor said there was no legal adjournment because of Fargnoli's failure to put the question of adjournment to a roll-call vote.

The solicitor's advice to Pearlman relative to the continuance of a quorum brings to mind *Moore* v. *Langton*, 92 R.I. 141, 167 A.2d 558 (1961), where this court spoke of the well-recognized principle which holds that when a legislative record shows that a quorum is present at the beginning of a legislative session, there is a presumption that the quorum continues throughout the session. However, this presumption exists only if there is no evidence to the contrary. *Id.* at 147-48, 167 A.2d at 561. In *Moore* the presumption

[7]See note 1.

concerning the continuity of the quorum vanished like a bursting bubble once the Journal of the House of Representatives for April 27, 1960, showed that only forty-one of the one hundred members had participated in a vote which had supposedly passed a bill calling for the imposition of tax on intangible personal property. The House Journal, this court said, showed "with transparent clearness" that there was no quorum present when the intangible tax bill came on for enactment. *Id.* at 149, 167 A.2d at 562.

The clerk's journal demonstrates with the same degree of clarity that the council's confirmation of the mayoral appointments in issue was given at a time when there was no quorum present. The trial justice paid little heed to the documentary and other proof which showed but eleven councilmen available to vote on the incoming appointments.

The official record of the post-walkout roll call reveals that there were at most twelve council members available to vote on the incoming appointments. The trial justice, however, added to that total the names of Garan and a second councilman, Laurence K. Flynn (Flynn). Inclusion of Garan and Flynn by the trial justice brought to fourteen the number of available council members, enough to establish the existence of a quorum. However, in taking this position, the trial justice misconceived not only the law but also material evidence.

In counting Garan and Flynn among those present for purposes of establishing a quorum, the trial justice relied upon a doctrine which he described as "physical presence at [a] meeting makes [one] eligible to be counted toward a quorum" and cited as support for this doctrine *Launtz* v. *People*, 113 Ill. 137 (1885); *State ex. rel. Young* v. *Yates*, 19 Mont. 239, 47 P. 1004 (1897); and *Northwestern Bell Telephone Co.* v. *Board of Commissioners*, N.D., 211 N.W.2d 399 (1973). The courts in all three cases were concerned with the effect upon a particular requisite majority needed for passage of an ordinance when a member of a municipal council who is actually present at the time when the vote is taken abstains from voting. A diversity of

opinion exists about the effect which results when a legislator who is present as a question is pending before the body refrains from voting on the question. Some courts take the view that silence is acquiescence in the position taken by the majority who vote, while other courts take a contrary position. The conflicting views which have been expressed on this issue can be found in 63 A.L.R.3d 1072 (1975). The annotation makes clear that the doctrine alluded to by the trial jusice comes into play "provided, of course, that there was a quorum." *Id.* at 1077, §3. Yet the existence of a quorum is the very issue so hotly disputed in this controversy. It is apparent, therefore, that the trial justice has equated *abstention* with *absence*, and in so doing he has erred.

The inapplicability of the particular legal principle relied upon by the trial justice when he included the names of Garan and Flynn is not the only, or even the crucial, basis for his having erred. Putting aside the question of Garan's status at the time of the post-walkout roll call, we find that there is no basis upon which to determine that Flynn was "present" at the time of that vote. In finding to the contrary, the trial justice stated that Flynn himself had testified that he was in the council chamber. An examination of the transcript, however, reveals that Flynn actually testifies that he at no time returned to the council chamber once the "Regular Democrats" had decided to break the quorum. According to Flynn's uncontradicted testimony, at the time the second roll call was being taken, he was standing in the entryway that leads from the rear of the gallery portion of the council chamber[8] to the outside corridor. As he stood there, he

---

[8]The council chamber is composed of two sections, each separated from the other by a railing. The forward portion or "floor" of the chamber is, by council Rule 8, reserved for the council members, the city clerk, various other municipal officers, and members of the press. Each councilman is assigned a desk in this area, and from there each can rise, be recognized, discuss the issue under consideration, and vote. To the rear of the railing is an area known as the gallery. Here the public can sit and view the proceedings taking place on the council floor. The evidence is quite clear that on the night of July 12 there was "standing room only" in the gallery as approximately one hundred spectators crowded the area. Many, if not most of the spectators had come to the meeting to witness the council's consideration of the tax-freeze ordinance.

peeked over the shoulders of the crowd and could see Fargnoli standing at the podium. Although it would be a difficult task indeed to define with precision the meaning of the word "present" for purposes of establishing a quorum, we need in this case note only that physical positioning in the doorway of the chamber cannot suffice. Flynn himself must certainly have felt that he had absented himself, for once the roll had been called, he left City Hall and did not return.

Since the trial justice erred in including Flynn as being among those who were available and prepared to exercise their official duties, the maximum number of council members present is reduced to thirteen, the minimum number necessary to constitute a quorum. No one has questioned the clerk's good faith as she called the roll and recorded the responses or lack of responses. She testified that she did not see Garan or Flynn in the chamber, nor did they in return respond to their calls. Her journal, an official record[9] of what transpired, at least up until the moment she and her associates left the council chamber, made it clear that the "Regular Democrats," after discovering that they were to be outvoted, had determined to break the quorum.

Garan testified that at the time of the roll call he was beyond the rail in the gallery portion of the chamber. After Pearlman had assumed the office of acting president pro tempore, Garan returned to the floor and addressed remarks to both the chair and the crowd, in which he complained about the propriety of conducting a meeting with half the membership absent, and explained that the crowd had come to hear the council consider the tax-raise proposal, not political appointments. Garan said he left City Hall before any of the mayor's appointments were approved.

---

[9]At oral argument a question was raised that the clerk's journal was not an "official" record because the minutes of the July 12 meeting had not yet been approved. An official record is one kept pursuant to the official duty of a particular officer, even if not specifically mandated by statute. *State* v. *Biscoe,* 112 Ariz. 98, 99, 537 P.2d 968, 969 (1975). As noted in this opinion, the Providence City Charter requires the clerk to keep a journal of all acts and proceedings which take place at a council meeting. Her journal is an official record notwithstanding the lack of the council's imprimatur.

Even if Garan's sequestration in the gallery and his post-walkout floor appearances make him eligible to be included as one of the required thirteen, the legislative body count still comes up short. This is so because it must be kept in mind that one of those bodies belonged to Fargnoli, and he had left the chamber immediately after the clerk had announced her tally. Consequently, Fargnoli's departure reduced the maximum number of available individuals to twelve, one shy of the quorum.

Apart from the clerk's journal, the record contains other ample evidence which destroys the presumption that the quorum present as the council paid homage to our flag and the country for which it stands still prevailed as the evening wore on.

We live in an electronic age. One of the exhibits introduced without objection at the Superior Court hearing is the clerk's tape recording of the July 12 meeting from its beginning up until the time the recorder was discontinued as the clerk's deputies followed her lead and left the chamber. The tape gives the listener a vivid portrayal and a keen feeling of what transpired as the "Regular Democrats" and the mayor's adherents squared off following the submission of the Glantz appointment. The legislative courtesy of one colleague to another, which was evident as the meeting began, vanished as tempers began to rise and one councilman told another to stop "acting like a juvenile," while the colleague retorted, "I'm not a juvenile * * *, I may not be a fancy lawyer like yourself, but I'm speaking my mind." The recorder caught the tumult of the crowd as it shouted and applauded Garan in his several post-walkout floor appearances at the microphone. The tape also conveys the strident tones of Gorodetsky as he told the departing Fargnoli that "the meeting will go on without you and without the rest of the Council too." Finally, due to the recorder's broad sweep, the listener can overhear the clerk's on-the-spot concern as, in an aside to Gorodetsky, she tells the councilman: "I think Jack Rotondi is not telling me as it is. In all the years I have

been in this City Hall I have never seen a council meeting held without a quorum." Gorodetsky in return suggested to the clerk that "you go on with it." When the clerk replied, "How can I go on," Gorodetsky responded; "Tell you why. Because if it's illegal, then you haven't done anything wrong by continuing on with it. If it's not illegal, then you have done something wrong." Following this exchange, the shout of the crowd signals the clerk's departure.

Further evidence establishing the absence of a quorum came from the lips of Pearlman. During his appearance as a witness at the Superior Court hearing, July 12's acting president pro tempore reported that when he adjourned the council, a roll-call vote was taken, and the adjournment vote carried eleven to zero.

Finally, we would point out that when this controversy came on for argument, Glantz conceded to us that at the time the Bucci, Dettore, and Smith appointments were before the council, there was no quorum but defended his position on the ground that no one objected to the meeting's continuing.

Glantz and the trial justice took the position that no one can be heard to complain about the absence of a quorum because the issue, in the words of the trial justice, "was not properly raised in accordance with the procedures set forth in Robert's Rules of Order and City Council Rules" and "any business conducted by the council was valid." One simple response to this position is that we are not concerned whether Fargnoli or any of those who bolted from the meeting have the necessary expertise to be admitted to membership in the American Institute of Parliamentarians.[10] The fact that after the walkout no one raised a "point of order" as prescribed by

---

[10]At the Superior Court hearing, the Executive Director of the American Institute of Parliamentarians was presented by the respondents as an expert who could testify concerning the intricacies of the workings of Robert's Rules of Order. After an objection had been lodged to its use, the trial justice admitted the director's testimony de bene, stating that he would rule on its admissiblity at another time. There is nothing in the record which indicates that the trial justice either ruled on the admissibility or relied on the expert's advice.

Robert's Rules is of little moment. The council's adoption of the no adjournment or recess without a roll-call vote is, on this record, of little significance. The decisive factor in this dispute is the well-established common-law principle that a majority constitutes a quorum,[11] and if a quorum is not present, a legislative body cannot act because any action taken in the absence of a quorum is a nullity. *Moore* v. *Langton*, 92 R.I. at 147, 167 A.2d at 561; Robert's Rules ch. XI, §39 at 293-95.

The no-adjournment-no-recess roll-call motion became meaningless verbiage once the quorum had dissolved. At that point the council, because of the withdrawal of the "Regular Democrats," was powerless to conduct any further business. What is of particular concern in this facet of the controversy is the right of individuals such as petitioners, who have been appointed to public office and ousted from that office, to have their ultimate fate as public officers decided by a duly constituted body. It is obvious that, so far as these petitioners are concerned, this was not the case.

The events which took place in Providence City Hall on the evening of July 12, 1978, are somewhat similar to an episode which occurred before the turn of the century and is described by the Michigan Supreme Court in *Dingwall* v. *Common Council*, 82 Mich. 568, 46 N.W. 938 (1890). There the court was confronted with a "disgraceful squabble between two factions of the common council of the city of Detroit, each seeking to get the advantage of the other in the appointment of election inspectors * * *." *Id.* at 571, 46 N.W. at 938. One faction left the meeting with the express purpose of breaking the quorum. The presiding officer had adjourned the meeting without a roll-call vote, and the remaining faction continued on with business, including the appointment of the inspectors. In upholding a challenge to

---

[11]Breaking a quorum is a device whose use is not restricted to legislative chambers. It is sometimes employed in the corporate world by shareholders. *See* *Levisa Oil Corp* v. *Quigley*, 217 Va. 898, 234 S.E.2d 257 (1977).

this action, the court, in some of its more pertinent observations, commented:

> "The minority were not justified in leaving the council, and the action of President Griggs in declaring the council adjourned was an outrage and cannot be excused. No presiding officer can arbitrarily adjourn a meeting in defiance of the majority present. * * * And these men who thus left the council chamber * * * are entitled to no favor at the hands of the courts. But this does not excuse the illegal action of those who remained. They well knew that they were without such a quorum * * *. The courts cannot allow such proceedings to stand."

Much of what was said in *Dingwall* might well be said here. The "Regular Democrats' " walkout may displease a great segment of the city's population, but their displeasure can be manifested at the polling place. Again, the walkout may not appeal to others who equate the goings on in the political arena as something akin to a sporting event and who abide by the adage that it matters "not that you won or lost — but how you played the game."[12] Even though unsportsmanlike conduct in a football game may result in a 15-yard penalty, the July 12 walkout gives no grounds for this court to declare what is obviously invalid — valid.

Accordingly, the July 12, 1978, appointments of the respondents Bucci, Dettore, and Smith are null and void. The petitioners Derrig, Sheehan, and McManus are legally entitled to retain the offices of Park Commissioner. Chairman of the Board of Licenses, and member of the Tax Assessment Board of Review, respectively.

Mr. Chief Justice Bevilacqua and Mr. Justice Weisberger did not participate.

---

[12]Grantland Rice's memorable comment about sportsmanship deserves to be quoted in full: "When the One Great Scorer comes to write against your name — He marks — not that you won or lost — but how you played the game."

*Abedon, Stanzler, Biener, Skolnik & Lipsey, Milton Stanzler, Lynette Labinger, Edward Beiser*, for plaintiffs.

*Ronald H. Glantz*, Acting City Solicitor, *Joseph A. Rotella, James Murray*, (for intervenor), *Thomas W. Pearlman*, (for intervenors), for defendants.