(No. 54408

PHILIP J. ROCK *et al.,* Petitioners, v. JAMES R. THOMPSON, Governor, *et al.,* Respondents.

*Announced February 9, 1981.—Opinion filed
June 26, 1981.*

Herman G. Bodewes and John R. Keith, of Spring-field, for petitioners.

Tyrone C. Fahner, Attorney General, of Springfield (Herbert Lee Caplan, Assistant Attorney General, and Samuel W. Witwer and Thomas E. Kluczynski, Special Assistant Attorneys General, all of Chicago, of counsel), for respondents.

MR. CHIEF JUSTICE GOLDENHERSH delivered the decision of the court and the following opinion in which MR. JUSTICE WARD and MR. JUSTICE CLARK join:

On January 19, 1981, pursuant to Supreme Court Rule 381 (73 Ill. 2d R. 381), we allowed the motion of Senators Philip J. Rock and James H. Donnewald, hereafter petitioners, for leave to file an original action for *mandamus* and an injunction. The petition prays for the issuance of a writ of *mandamus* directed to James R. Thompson, Governor of Illinois, hereafter respondent, "as Governor, to convene the Illinois Senate to elect from its membership a President of the Senate as presiding officer" and for an injunction restraining respondent Senator David C. Shapiro "from assuming or otherwise conducting or attempting to conduct the duties of office of President of the Senate during the pendency of these proceedings." We ordered an expedited briefing schedule, heard oral argument on January 27, and on February 9 ordered that a writ of *manda-*

*mus* should issue, "directed to the respondent, James R. Thompson, Governor of the State of Illinois, commanding that pursuant to article IV, section 6(b), of the Constitution he convene the Senate and, following the adoption by the Senate of a rule fixing the number of votes required to elect such officer, proceed with the election of a President." We further noted in our order that "An opinion setting forth the reasons for this order will be filed in due course." See, *e.g., Coalition for Political Honesty v. State Board of Elections* (1980), 83 Ill. 2d 236; *Dooley v. McGillicudy* (1976), 63 Ill. 2d 54, 55.

Article IV, section 6, of the Illinois Constitution of 1970 provides in part:

> "(a) A majority of the members elected to each house constitutes a quorum.
>
> (b) On the first day of the January session of the General Assembly in odd-numbered years, *** the Governor shall convene the Senate to elect from its membership a President of the Senate as presiding officer.
> ***
> (d) Each house shall determine the rules of its proceedings, *** and choose its officers. ***"

Transcripts of the proceedings show that respondent convened the Senate of the Eighty-Second General Assembly on January 14, 1981. Following the administration of the oaths of office to newly elected members of the Senate, and several ceremonial matters, the Senate adjourned until 10 a.m. on January 15, 1981.

Transcripts of the Senate proceedings of January 15, 1981, certified by Edward E. Fernandes as Secretary of the Senate, show that immediately following an opening prayer the roll was called and 51 of 59 elected Senators were declared present. Respondent indicated that a quorum was present and opened the nominations for President of the Senate. Senators Shapiro and Rock were nominated and the nominations were seconded. A motion that the Senate adjourn until February 10 was made and

seconded, and a motion was made to table the adjourn-
ment motion. By a vote of 50 ayes to 5 nays the motion
to adjourn was tabled. Nominations were closed, and re-
spondent announced that a vote to elect the President
would be held, ruling that "the vote of a majority of the
members present and voting will be required to elect the
President." Senator Dawn Clark Netsch appealed the
ruling of the chair, stating:

> "I would just question that ruling, it is completely contrary
> to everything that has been established as precedent and
> indeed to your own ruling of last Session, as I recall. It
> is— has required a majority of the Senators elected to the
> Senate, that has been our practice, at least, in the eight
> years that I have been here, and I can recall, at least, two
> explicit rulings, and I believe three to that effect."

Respondent explained his ruling by noting that "in
the absence of a limitation in the Constitution, in the ab-
sence of a limitation in a Statute, in the absence of any
pending ruling of this Senate now in effect, it is the opin-
ion of the Chair that the Body has the right to conduct
its business by *** a vote of the majority of the members
present and voting." Senator Netsch's appeal was sec-
onded. Upon a request being made, a recess was called for
party caucuses.

The transcripts show further that, upon reconvening,
there was a call for a vote on Senator Netsch's appeal.
After brief debate concerning a motion to limit debate
Senator Netsch questioned the presence of a quorum and
the Governor ordered that the roll be called to determine
whether a quorum was present. While the transcript shows
that the acting secretary began calling the names of the
Senators aloud, the transcript does not reflect an affirma-
tive response of "present" or a negative response of "not
present" for each Senator called during this roll call. The
names of 27 Senators had been called when respondent
noted that: "the mover *** on the question of the
quorum has left the Floor, and so, her request is now out

of order. Stop the roll call. I'm sorry, she's come back. Continue the roll call for as long as she remains on the floor." The names of 10 more Senators were then called, when once again respondent ordered the roll call stopped because "the questioner of the quorum has left the floor." A vote was then taken on Senator Netsch's appeal from the ruling of the chair, and the chair was sustained by a vote of 29 ayes to no nays.

Next the roll was called for election of the President of the Senate, during which respondent stated "The Chair notes the— presence of Senator Savickas," and after which respondent stated: "The Chair will again note *** that Senator Frank Savickas was present on the Floor of the Senate during the roll call." While the names of all 59 Senators were called during this vote, the transcript shows only that Senator Shapiro received 29 votes and Senator Rock received no votes. Senator Savickas, whose name was called twice during the voting, did not respond either time. A motion to reconsider the vote by which Senator Shapiro was declared the President of the Senate was tabled on a voice vote. Following the administration of his oath, Senator Shapiro made a brief speech, and, in commenting on the appointment of a committee to escort the Governor from the Senate chamber noted: "I am sorry to say that at the present time there is no one on the Democratic side available to provide their members to the honor guard." Senator Shapiro then appointed assistant majority leaders, and further commented: "And since there is no one here from the loyal opposition, a Minority Leader will be selected by the Democratic Party at a later date."

The transcript also shows that the Senate proceeded to adopt a number of resolutions but that the only matter on which the vote was recorded was the selection of the body's "permanent " officers. These officers were elected by a vote of 29 ayes and no nays.

We consider first the respondents' contention that *mandamus* is not an appropriate remedy. They argue that a writ of *mandamus* cannot be used to compel the respondent Governor to "undo a performed act and redo it in another manner." Further they contend that as presiding officer the Governor "must engage in a variety of discretionary acts, including parliamentary rulings" and that "where the doing of the thing demanded is discretionary with the respondent, mandamus will not lie to compel it." Respondents also argue that "the acts which petitioners seek to compel the Governor to perform require the conduct, approval, and cooperation of the Senate" and *mandamus* is inappropriate where the official act to be performed depends upon the cooperation of a third party. It is also argued that the legal right of Senator Shapiro to hold his office can only be attacked through a proceeding in *quo warranto*.

Petitioners contend that the duty to convene the Senate is "ministerial" and "is a present and continuing duty required to be performed by the Governor in accordance with the legislative provisions of the Constitution." They argue, too, that the court can act in *mandamus* where public issues of serious concern require a speedy resolution. Further, petitioners contend that the Governor's acts are "for the purposes of this proceeding no acts and the Governor has not performed the duty enjoined upon him ***."

We note first that the pleadings in this case present no issue of what remedy may be appropriate, if any, in the event of the refusal on the part of the Senate to approve and cooperate in the performance of any act ordered by this court. Further, they present only as a secondary issue the question of the legal right of respondent Shapiro to hold the office of President of the Senate. The pleadings present only the questions whether the respondent Governor has failed to comply with the provision of article IV,

section 6, of the Constitution and, if so, whether a writ of *mandamus* may appropriately issue requiring such performance.

Prior decisions of this court provide ample authority to hold that this court has jurisdiction to consider an original action in *mandamus* and, if appropriate, issue the writ. For many years the Election Code provided that "The Governor ***, the Secretary of State, *** the Attorney General, the State Treasurer, and the Auditor of Public Accounts shall constitute the State Electoral Board." (Ill. Rev. Stat. 1951, ch. 46, par. 7—14.) In *People ex rel. Scott v. Kerner* (1965), 32 Ill. 2d 539, and *People ex rel. Meyer v. Kerner* (1966), 35 Ill. 2d 33, this court granted leave to file original actions in *mandamus* and issued writs to the Electoral Board of which the incumbent Governor was a member. We perceive of no distinction between our jurisdiction to *mandamus* the Governor to perform a ministerial act prescribed by statute as a member of a collegial body and our jurisdiction to *mandamus* the performance of a ministerial duty imposed by the Constitution.

We have considered respondents' argument that *mandamus* will not lie to direct the performance of an act "where the doing of the thing demanded is discretionary with the respondent." We agree that while *mandamus* will not lie to direct the manner in which the discretion is to be exercised, it is available to compel the performance of an action which requires the exercise of discretion or even to compel the exercise of discretion itself. *People ex rel. Chesapeake & Ohio Ry. Co. v. Donovan* (1964), 30 Ill. 2d 178.

Simply stated, the issues raised and argued by the pleadings present the narrow question whether the Governor has complied with the constitutional directive "that he shall convene the Senate to elect from its membership a President of the Senate as presiding officer." If, as con-

tended by petitioners, the purported election of the respondent Shapiro did not conform to the requirements of the Constitution, then the constitutional duty has not been performed and *mandamus* may appropriately lie. If, on the other hand, the purported election of the respondent Shapiro complied with the requirements of the Constitution, or if, as contended by respondents, this court is precluded from inquiring into the proceedings of the Senate in said purported election, then the writ must be denied.

Respondents recognize that "when a constitutional or statutory violation on behalf of the executive or legislative branch is asserted, the courts obviously have the obligation to correct it." They contend, however, that the court has no jurisdiction to "enter into the legislative thicket" on matters relating to the organization and operation of the Senate, a legislative body. They argue that "petitioners seek to have internal discretionary activities of an independent branch of government reviewed by this Court." This, they contend, is proscribed by the doctrine of separation of powers. Petitioners argue that the doctrine of separation of powers does not prevent the court from ascertaining compliance with or mandating performance of constitutional duties. We agree.

Since the decision in *Field v. People* (1839), 3 Ill. 79, the separation of powers principle has not been understood to mean a separation of functions between the three branches of government which is so "distinct as to have no connection or dependence ***; but its true meaning, both in theory and practice, is, that the whole power of two or more of these departments shall not be lodged in the same hands, whether of one or many. That this is the sense in which this maxim was understood by the authors of our government, and those of the general and State governments, is evidenced by the Constitutions of all. In every one there is a theoretical or practical recognition of this

maxim, and at the same time a blending and admixture of different powers. This admixture in practice, so far as to give each department a constitutional control over the other, is considered, by the wisest statesmen, as essential in a free government ***." (3 Ill. 79, 83-84.) It is the duty of the judiciary to construe the Constitution and determine whether its provisions have been disregarded by the actions of any of the branches of government. (*People ex rel. Harrod v. Illinois Courts Com.* (1977), 69 Ill. 2d 445, 458; see also *Powell v. McCormack* (1969), 395 U.S. 486, 506, 23 L. Ed. 2d 491, 508, 89 S. Ct. 1944, 1956.) While this court cannot exercise legislative powers (see, *e.g., Fergus v. Marks* (1926), 321 Ill. 510), the judiciary has always had the right and duty to review legislative acts in light of the Constitution. As the court said in *Donovan v. Holzman* (1956), 8 Ill. 2d 87, 93: "The mere fact that political rights and questions are involved does not create immunity from judicial review. [Citations.]"

Respondents argue by analogy to the enrolled-bill doctrine (Ill. Const. 1970, art. IV, sec. 8(d); *Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142) that "the swearing and signing the oath of office by Senator Shapiro and its certification to the Secretary of State is equivalent to the certification of a bill by the presiding officer of the Senate." Thus, they argue, judicial review of the actions of the respondents and the Senate is foreclosed. Article IV, section 8(d), of the Illinois Constitution of 1970 provides in pertinent part that "The Speaker of the House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met." Pursuant to this provision, the signatures of the presiding officers are conclusive proof that all constitutional procedures have been properly followed in the manner of passage, if the bill shows on its face that it was properly passed. (See *Polich v. Chicago School Finance Authority* (1980), 79 Ill. 2d

188, 211.) There is no constitutional basis for a similar presumption of validity with respect to the swearing and signing by Senator Shapiro of the oath of office and its certification to the Secretary of State. Furthermore, the petition alleges not merely procedural deficiencies, but substantive constitutional defects, which may be determined from the transcript. See *Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142.

Turning to the substantive issues, we consider first petitioners' contention that when the Senate action was taken on January 15, 1981, no quorum was present as required by article IV, section 6(a), of the 1970 Constitution.

The Constitution is silent on the effect of the absence of a quorum in a legislative body. (Compare Ill. Const. 1970, art. VI, sec. 3.) However, the parties are in agreement that in the absence of a quorum the election of Senator Shapiro as President would be invalid. It is an axiom of parliamentary law that "No question can be decided and no official action can be taken in the absence of a quorum, except to order a call or to adjourn." (P. Mason, Manual of Legislative Procedure for Legislative and Other Governmental Bodies sec. 505(1), at 350-51 (1979) (hereinafter cited as Mason).) It follows from this that "In the absence of a quorum, any business transacted *** is null and void." H. Robert, Robert's Rules of Order Newly Revised sec. 39, at 295 (S. Robert ed. 1981) (hereinafter cited as Robert's).

Respondents contend that "the only evidence available to this Court is the transcript of the proceedings. That document fails to reveal the absence of a quorum. In the absence of a contrary rule, the existence of a quorum may be determined by the presiding officer. [Citations.] The presiding officer's determination of the quorum question is presumptively valid." Citing *Auditor General v. Board of Supervisors* (1891), 89 Mich. 552, 51 N.W. 483, re-

spondents argue that a quorum, once ascertained, is presumed to continue. Citing *Launtz v. People ex rel. Sullivan* (1885), 113 Ill. 137, they assert that "Once a quorum has been established, legislative action may not be impeded by abstentions or refusals to participate."

In *Auditor General* a writ of *mandamus* was sought to compel a county board to levy State tax apportioned to that county for a certain year. The board set up in its answer a defense that the action of the Michigan Senate was taken in the absence of a quorum and was therefore invalid. According to the legislative journal, a roll call was taken on the adoption of a particular report and showed the presence of a quorum. The resolutions for which a quorum was allegedly absent followed. In holding that the resolution vote was valid the Supreme Court of Michigan said:

> "The vote had upon the resolutions *** appears to have followed immediately after the roll-call upon the adoption of the report, as no other business intervened. There was no recess taken, and no senator asked to be excused. ***. Must it not be presumed in such case that the quorum continued to be present, and must not that presumption be conclusive? *** The presumption as to the correctness of the journal in this case is supplemented by the further presumption as to the continuance of a quorum once ascertained and recorded, and that within a few moments, it may be a few seconds, of the time when the vote was had which is now attacked." 89 Mich. 552, 563-64, 51 N.W. 483, 487.

*Launtz* involved an action taken by the city council of East St. Louis. The council was comprised of eight aldermen and the mayor, and at the meeting in question all eight aldermen were present. Four voted in favor of the proposal in question and four "refused to vote." The

mayor thereupon declared the measure carried. This court held the action valid and stated the governing principle as follows:

> " 'After an election has been properly proposed, whoever has a majority of those who vote, the assembly being sufficient, is elected, although a majority of the entire assembly altogether abstain from voting, because their presence suffices to constitute the elective body; ***.' " 113 Ill. 137, 142.

In our opinion, respondents' contention that a quorum must be presumed to have been present at the time of the election of Senator Shapiro is supported by neither *Auditor General* nor *Launtz*. In *Auditor General*, the Michigan court, by specifically recognizing that no recess intervened between the reported roll call and the resolution vote, implied that an intervening recess would have necessitated a different result. (See also Mason, sec. 504(2), at 349, on the effect of a recess, and sec. 504(1), at 349, on the effect of a vote on the presumption of a quorum.) Moreover, there, the journal did not, as does the transcript before us, record a challenge to the presence of a quorum. Thus, every reason existed in *Auditor General* to presume the continued presence of a quorum, and we do not deny the utility and ultimate fairness of such a presumption in those circumstances. However, respondents have not suggested why such a presumption should apply where a recess interrupts a legislative proceeding, where the existence of a quorum is challenged after the recess, and where an incomplete quorum roll call and other recorded votes fail to demonstrate the presence of a quorum.

In *Launtz* the presence of a quorum was not disputed. The issue was whether a refusal to vote by a majority of those present served to invalidate the act of the others. Since a quorum was clearly present in *Launtz*, it is inapposite to our consideration of this case. See also *Clark v.*

*City Council* (1951), 328 Mass. 40, 101 N.E.2d 369; *Attorney General v. Remick* (1902), 71 N.H. 480, 53 A. 308.

More nearly on point is the recent case of *Fargnoli v. Cianci* (1979), —— R.I. ——, 397 A.2d 68. That case concerned the Providence city council's confirmation of 28 mayoral appointments. When the council meeting in question was called to order 20 of the 24 qualified council members were present. Prior to the meeting in question the mayoral appointments had been repeatedly rejected. However, three Democrats (the majority party) were hospitalized when the meeting in question was called and as a consequence the Republican councilmen outnumbered the Democrats 11 to 9. After heated oratory, 9 councilmen walked out. The 11 remaining members unanimously approved the mayoral appointments, having been advised by the assistant city solicitor that it was sufficient that there was a quorum at the outset of the meeting. Regarding this advice, the Supreme Court of Rhode Island said:

"The solicitor's advice *** relative to the continuance of a quorum brings to mind *Moore v. Langton,* 92 R.I. 141, 167 A.2d 558 (1961), where this court spoke of the well-recognized principle which holds that when a legislative record shows that a quorum is present at the beginning of a legislative session, there is a presumption that the quorum continues throughout the session. However, this presumption exists only if there is no evidence to the contrary. *Id.* at 147-48, 167 A.2d at 561. In *Moore* the presumption concerning the continuity of the quorum vanished like a bursting bubble once the Journal of the House of Representatives for April 27, 1960, showed that only forty-one of the one hundred members had participated in a vote which had supposedly passed a bill calling for the imposition of a tax on intan-

gible personal property." —— R.I. ———, ———, 397 A.2d 68, 75.

In *Fargnoli,* the court also addressed the trial court's determination that certain council members who were arguably "present" in the council chambers should be counted toward a quorum:

"[T]he trial justice relied upon a doctrine which he described as 'physical presence at [a] meeting makes [one] eligible to be counted toward a quorum' and cited as support for this doctrine *Launtz v. People,* 113 Ill. 137 (1885); *State ex rel. Young v. Yates,* 19 Mont. 239, 47 P. 1004 (1897); and *Northwestern Bell Telephone Co. v. Board of Commissioners,* N.D., 211 N.W.2d 399 (1973). The courts in all three cases were concerned with the effect upon a particular requisite majority needed for passage of an ordinance when a member of a municipal council who is actually present at the time when the vote if taken abstains from voting. A diversity of opinion exists about the effect which results when a legislator who is present as a question is pending before the body refrains from voting on the question. Some courts take the view that silence is acquiescence in the position taken by the majority who vote, while other courts take a contrary position. The conflicting views which have been expressed on this issue can be found in 63 A.L.R.3d 1072 (1975). The annotation makes clear that the doctrine alluded to by the trial justice comes into play 'provided, of course, that there was a quorum.' *Id.* at 1077, sec. 3. Yet the existence of a quorum is the very issue so hotly disputed in this controversy." —— R.I. ———, ———, 397 A.2d 68, 75.

Respondents' contentions regarding the presumptive validity of a presiding officer's quorum determination (see

Mason sec. 503(3), at 347, and sec. 504(6), at 350) are equally unpersuasive in the factual context of this case. Absent challenge or evidence to the contrary, certainly a presiding officer's determination that a quorum exists during a legislative session is entitled to a presumption of validity. Any other rule would unduly encumber the legislative process. However, to conclusively presume the presiding officer's determination to be correct would serve only to vitiate the quorum requirement. This fact is recognized in Robert's Rules of Order wherein it is said, "When the chair has called a meeting to order after finding that a quorum is present, the continued presence of a quorum is presumed unless the chair or a member notices that a quorum is no longer present." Robert's sec. 39, at 296.

We are of the view that, absent a contrary rule adopted by the legislative body, a presiding officer's determination of the presence of a quorum is presumed correct until challenged or until a vote discloses the absence of a quorum.

Finally, apart from the assertions regarding presumptions of a quorum, respondents contend "it is clear that, in addition to the 29 Senators who voted, Senator Savickas was present in the chamber; and the Governor made an appropriate factual finding for the record."

Apposite to our consideration of this issue is the parliamentary dispute which arose in the Fifty-First United States Congress concerning the presence of a quorum. Events, as described by J. Tilson in Parliamentary Law and Procedure 18-19, were as follows:

> "Although apparently it was the earlier practice to determine by a count, it had become the later practice of the House to accept the report of a roll call as to whether or not a quorum was present. ***
> On one occasion when the roll call was completed it failed to show a quorum present. Whereupon Speaker Reed directed the Clerk to record as present a sufficient number

of additional members then sitting in front of him, naming them, to make up the necessary quorum."

Ultimately the propriety of Speaker Reed's action came before the United States Supreme Court in *United States v. Ballin* (1892), 144 U.S. 1, 4-5, 36 L. Ed. 321, 12 S. Ct. 507. The court based its decision on House Rule 15, which provided:

" 'On the demand of any member, or at the suggestion of the Speaker, the names of members sufficient to make a quorum in the hall of the House who do not vote shall be noted by the clerk and recorded in the journal, and reported to the Speaker with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business.' " (144 U.S. 1, 4-5, 36 L. Ed. 321, 324, 12 S. Ct. 507, 509.)

The court noted that all the Constitution required was the "presence of a majority," then said:

"But how shall the presence of a majority be determined? The Constitution has prescribed no method of making this determination, and it is therefore within the competency of the House to prescribe any method which shall be reasonably certain to ascertain the fact." (144 U.S. 1, 6, 36 L. Ed. 321, 325, 12 S. Ct. 507, 509.)

It was held that Rule 15 was reasonable and the Speaker's action thereby valid.

It has been concluded, based on the holding in *Ballin,* that absent a rule such as Rule 15 a presiding officer does not possess the authority to count nonvoting members in order to make up a quorum. In *State ex rel. Stanford v. Ellington* (1895), 117 N.C. 158, 23 S.E. 250, it was said, with reference to *Ballin:*

"But it seems to be conceded that the speaker of the House of Representatives of the United States could not compel a member to vote. Nor had he any right to count members present and not

voting, to make a quorum, until the House adopted a rule to that effect. \*\*\* So may the legislature of North Carolina adopt a similar rule as there is nothing in the Constitution to prevent its doing so. But it has not adopted such a rule and under the authority of *U.S. v. Ballin, supra,* we suppose the presiding officers were powerless if a quorum was actually present, either to make them vote or count them to make up a quorum." 117 N.C. 158, 162, 178-79, 23 S.E. 250, 251.

See also *In re Gunn* (1893), 50 Kan. 155, 32 P. 470, 475.

In the circumstances of this case we are of the opinion that the Governor was without authority, inherent, express or implied, to make factual determinations for the record as to the presence of nonvoting Senators. The authority of a presiding officer is most often derived wholly from the body by which he is elected and over which he presides. (Mason sec. 579(1), at 420, Robert's sec. 29, at 218.) Here, the Governor was not elected by the Senate. Hence we need not search for authority inherent in a delegation of power from that body. Moreover, the cases we have just discussed suggest the absence of inherent authority to determine presence where a quorum is disputed. Furthermore, an examination of article IV, section 6(b), which requires the Governor merely to "convene" the Senate, yields no suggestion of such authority. The General Assembly has enacted legislation concerning the duties of the Governor upon convening the Senate (Ill. Rev. Stat. 1979, ch. 63, par. 23.3), but we find no indication there that the Governor was empowered to determine the presence of nonvoting Senators for the record. Finally, we note that at the time of the election the Senate had not adopted rules. However, even assuming the rules of the Eighty-First General Assembly were in effect, we find no rule authorizing the Governor's action.

Because the transcript fails to reflect the presence of a

quorum, we are of the opinion that the purported election of respondent Shapiro did not constitute compliance with the provision of article IV, section 6(b), that the Senate while convened, "elect from its membership a President of the Senate as presiding officer."

Even if a quorum was present when the foregoing action was taken, we would nevertheless be compelled to agree with petitioners' alternative contention that the purported election of respondent Shapiro was ineffective for the reason that he did not receive the votes of a majority of the members elected to the Senate.

In support of their contention that a "majority of a quorum" is the appropriate standard by which to judge the election, respondents rely upon the general proposition that "In the absence of a constitutional or statutory provision or rule of a legislative body to the contrary, it is universally accepted that the act of a majority of a quorum is the act of the body." We are in agreement with respondents' statement of the rule. (See, *e.g., Launtz v. People ex rel. Sullivan* (1885), 113 Ill. 137, 142.) However, we are of the opinion that under the Constitution the election of the President of the Senate requires the votes of a majority of the members elected to the Senate.

In *Peabody v. Russel* (1922), 301 Ill. 439, 442-43, it was said:

> "It is a canon of construction well recognized, not only in this court but in courts of other jurisdictions, as it relates to statutes, that the chief purpose is to give effect to the intention of the legislature. In seeking such intention courts are to consider the language used, the object to be attained or the evil to be remedied. This may involve more than the literal meaning of the words. That which is within the intention is within the statute though not within the letter, and though within the letter it is nevertheless not within the statute if not like-

wise within the intention. The same general principles to be applied in construing statutes apply in the construction of constitutions. [Citations.] In the construction of a constitution courts should not indulge in speculation apart from the spirit of the document, or apply so strict a construction as to exclude its real object and intent."

Insight is provided into the spirit and intent of article IV, section 6(a), of the 1970 Constitution by reference to the comments of Governor Thompson on the occasion of his convening the Senate on January 12, 1977, for the 80th General Assembly:

"The order of business is the election of the President of the Senate. Pursuant to Article IV, Section 6(a) of the Constitution of 1970 which provides in part '*** and the Governor shall convene the Senate to elect from its membership a President of the Senate as Presiding Officer ***.' Under the tradition of the Senate and in keeping with the spirit of the Constitution, the affirmative votes of the thirty Senators, a constitutional majority, will be required to elect the President."

On February 2, 1977, after an attempted appeal of Governor Thompson's earlier ruling, he further explained:

"This was a matter that was given a great deal of consideration by me, by my counsel and by my parliamentarian before the opening of the Senate Session and it was our unanimous conclusion that Senate history, Senate tradition and a respect for the spirit of the Constitution required the imposition of a constitutional majority and that was my reason for so ruling."

In addition we take note of the fact, as demonstrated by the record, that prior to the session in question, each time Governor Thompson was called upon to rule on the matter he required a constitutional majority of 30 votes. We note further that, since the effective date of the Constitution of 1970, the Senate has consistently required that the President be elected by a majority of the members elected.

A close examination of the Constitution necessitates the conclusion that the Senate President was intended to be elected by a majority of the Senate membership, not a "majority of the Senators present and voting," as Governor Thompson ruled on January 15, 1981, or a majority of a quorum as respondents now contend. Article IV, section 6(b), provides merely that "the Governor shall convene the Senate to elect from its membership a President of the Senate as presiding officer." It is silent on the nature of the majority required. There are 20 other provisions in the 1970 Constitution which require a vote of the Senate, House, or General Assembly (see Ill. Const. 1970, art. IV, sec. 5(c); art. IV, sec. 6(b); art. IV, sec. 6(d); art. IV, sec. 8(c); art. IV, sec. 9(c); art. IV, sec. 9(d); art. IV, sec. 9(e); art. IV, sec. 10; art. IV, sec. 14; art. V, sec. 9(a); art. V, sec. 11; art. VII, sec. 6(j); art. VIII, sec. 3(a); art. IX, sec. 9(b); art. XIII, sec. 8; art. XIV, sec. 1(a); art. XIV, sec. 2(a), and art. XIV, sec. 4), and although there is some variation in the size of the majority required, in no instance is it less than a majority of the members elected.

A constitutional provision must be construed, if possible, in a manner consistent with other provisions relevant to the same subject matter. (*People ex rel. Nauert v. Smith* (1927), 327 Ill. 11.) Were we to accept respondents' argument, a Senate President could be elected by as few as 16 members. Such a result would not only be anomalous when compared with all other votes required by the provisions of the Constitution, but it would unthinkably also demean the status of a constitutional officer. The Senate President holds office till a successor is both elected and qualified (Ill. Rev. Stat. 1979, ch. 63, par. 23.2) and is not subject to removal for inefficiency or neglect of duty (Ill. Rev. Stat. 1979, ch. 63, par. 23.1). Moreover, he has the constitutional duty to sign and certify bills (Ill. Const. 1970, art. IV, sec. 8(d)), and to appoint a member to the Legislative Redistricting Commission (Ill. Const. 1970,

art. IV, sec. 3(b)). Finally, of course, the President presides over the Senate. These protections afforded the President and duties imposed upon him are a clear indication of the importance of his office. It is inconceivable that the framers of the Constitution intended to permit the election of a constitutional officer by a minority of the Senate while, at the same time, requiring "a majority of the members elected" to concur in the Governor's appointment of nonconstitutional officers. (Ill. Const. 1970, art. V, sec. 9(a).) Rather, we hold that inherent in the command that the Senate "elect from its membership" a President is the requirement that such election be by a majority of the entire membership.

The writ of *mandamus* is awarded.

*Writ awarded.*

MR. JUSTICE SIMON, concurring in the decision:

It could be argued, based on *People ex rel. Bruce v. Dunne* (1913), 258 Ill. 441, that Illinois courts lack authority to mandamus the Governor. In view of that decision, I am not as sure as my colleagues, Mr. Chief Justice Goldenhersh and Mr. Justices Ward and Clark, that the Governor can be routinely mandamused. But, that question need not be decided in this case, because, after initially raising the issue, the Governor abandoned that defense. The Governor's withdrawal from that position allows this court to dispose of this case without the need to adjudicate the applicability or propriety of *mandamus* on the Governor when the Governor says he is not subject to *mandamus*. I, therefore, do not feel it necessary to express any further thoughts on that subject. If the legality of mandamusing the Governor over his objection is to be reconsidered, I feel it should be in a case where the relevant law on this delicate subject is fully argued, rather than where the Governor, as here, does not seek to avoid *mandamus* on that ground.

The Governor, much to his credit, agreed that the difficult legal issues this case raises should be decided by this court. Both sides urgently asked us to judge the case, and agreed that we should decide it on the merits. We need not hesitate, therefore, over the propriety of judicial interference with other branches of government. An action for *mandamus,* like the ultimate dispute over title to the office of Senate President, is a justiciable matter; we have subject matter jurisdiction.

Irrespective of whether the Governor may be mandamused against his will, where the Governor voluntarily submits to our jurisdiction, this court can decide a controversy which involves issuing a *mandamus* directed to him. (*People ex rel. Billings v. Bissell* (1857), 19 Ill. 229.) In the oral argument in this case, the Governor did not take the position he could not be mandamused. On the contrary, the Governor wisely concluded that the unresolved continuation of the controversy over the Senate presidency would be chaotic and stated that he was willing to have this court tell him if there is some constitutional duty he had left undone. Moreover, when the Senate Democrats tried self-help by electing Senator Rock president under highly irregular circumstances, the Governor and Senator Shapiro filed motions in this case seeking a protective order. Their argument was that Senator Rock could not be permitted to take into his own hands "the previously unquestioned power of the Judicial Branch to settle constitutional disputes." By the time we issued our order on February 9, 1981, it was clear that the Senate was unable to resolve its impasse without help, and the judiciary was the only body it could turn to for help. Had we not acted, the work of the Senate would have gone undone or been open to challenge, and Senators, once having resorted to physical conflict in trying to resolve the controversy, might have continued to do so. Having been presented with this controversy, it was better for us to decide than to

avoid decision.

The petitioners say that 30 votes were needed to elect a President, and Senator Shapiro didn't get them. The respondents say that a majority of the votes cast were sufficient to elect a President, and he got that. Both are wrong. This court cannot say how many votes were needed; that was for the Senate to decide. Until the Senate—after our order—made a valid determination on that question, there was no way to say whether any particular number of votes was enough. No valid election could be held until the Senate set the ground rules for it. Senator Shapiro's election was therefore invalid.

My colleagues agree with the petitioners that 30 votes, a majority of the Senators elected, are necessary to elect a President of the Senate. They offer three reasons.

In 18 provisions, the Constitution demands votes of two-thirds, three-fifths, or a majority of the Senators elected. Yet on the point at issue it is silent. My colleagues infer from the abundance of minimum-vote requirements that the election of a President must also require a minimum of 30 votes. I draw the opposite conclusion. The framers of the Constitution obviously knew how to require 30 votes when they wanted to. If they had meant to make a rule requiring a minimum number of votes to elect the Senate President, they would have said so, just as they did in 18 other places. The absence of such a requirement indicates to me that none was intended.

My colleagues next seek support for their argument by pointing to one particular act for which the Constitution says 30 votes are needed: confirming the Governor's appointments to office. Their reasoning is that the election of a Senate President is at least as important as the confirmation of other officers, and therefore must require at least as many votes. This contention rests, however, on the assumption that the Senate cannot remove its President once it elects him. I believe it can. There must be

some way to remove a President whose conduct is objectionable. But as only executive and judicial officers are subject to impeachment (Ill. Const. 1970, art. IV, sec. 14), the power to remove a legislative officer can only be in the chamber that chose him. The statute (Ill. Rev. Stat. 1979, ch. 63, par. 23.2) providing that the President holds office until his successor is elected and qualified merely guards against inconvenient gaps in the office; it does not bar affirmative removal. Nor does a statute providing that certain other officers may be removed for cause (Ill. Rev. Stat. 1979, ch. 63, par. 23.1) immunize the Senate President. Moreover, any attempt to limit the Senate's power over its officers by law rather than by its own rules of proceedings might well be unconstitutional. My view is that the President of the Senate serves at the pleasure of the Senate. Even if the President is removable only for cause, the office remains to a substantial degree within the control of the Senate. Thirty votes are needed to confirm gubernatorial appointments because the confirmation, once done, passes out of the Senate's control. An internal, reviewable matter like the election of the President could rationally be left to a lesser vote. The two kinds of action are different, and comparison of them is therefore inconclusive.

My colleagues' third point is that Governor Thompson himself has said on many occasions in past years that 30 votes are necessary, and that that view seems to have been widely held. But the Constitution's striking silence is not an ambiguity to be construed by giving weight to the practice of Senates and Governors since 1970. I believe the Constitution is silent intentionally. The vote requirement was to be left to the Senate itself, under its authority to "determine the rules of its proceedings *** and choose its officers" (Ill. Const. 1970, art. IV, sec. 6(d)). Expressions by the present Governor as well as past ones and individual Senators are neither the equivalent of the

constitutional requirement of a Senate rule nor sub-stitutes for the Constitution's silence.

I do not, therefore, accept my colleagues' conclusion that the Constitution requires 30 votes.

Just as the Constitution does not require 30 votes, neither does it establish a majority of those voting as enough. There is no constitutional provision that the act of a majority of those voting is the act of the Senate unless otherwise provided. All attempts to read into the Constitution some definite rule about how many votes are needed to elect a President are equally inconsistent with the Senate's right to determine its own rules. The Senate has regularly, by rule, required varying numbers of Senators (ranging from 2 to 40), or varying fractions of those voting, to accomplish various types of action. It is no less free to decide how it wants to go about electing its President.

The issue, then, reduces to: Is there a rule that applies until the Senate makes an express rule? The obvious source would be custom, either of the Illinois Senate or of parliamentary bodies in general. Does custom establish common law rules binding until changed by the Senate? I see many obstacles to using customary rules even if such rules clearly existed.

First, this case amply demonstrates that there may not always be any clear custom. If a lazy, confused, or deadlocked Senate could operate indefinitely under hazy but binding rules of custom and usage, the courts would be regularly called on to divine those rules. We should not be eager for that role. Nor does the Constitution leave such decisions to parliamentary texts such as Robert's Rules of Order. It leaves those decisions, rather, to the Senate itself.

Second, resort to custom and usage is inconsistent with the doctrine emanating from article IV, section 5(a), of the Constitution that the General Assembly is a new body

every two years (Ill. Const. 1970, art. IV, sec. 5(a)). Referring to custom to apply past procedures to a new Senate imposes upon the electorate viewpoints they may have voted to replace. Custom based only on previous practice or beliefs as opposed to rules expressly adopted is especially unsuitable for use in a new Senate.

Third, custom is inconsistent with the directive that the Senate *"shall* determine" its rules (emphasis added) (Ill. Const. 1970, art. IV, sec. 6(d)). Compare the Federal Constitution, providing that each house *"may* determine the Rules of its Proceedings" (emphasis added) (U.S. Const., art. I, sec. 5).

I conclude that custom does not by virtue of either the Illinois Constitution or the common law supply a body of rules for the Senate, even temporarily. It is, no doubt, a useful thing to have around, especially as any set of express rules is likely to overlook something. The Senate is free to be guided by custom in reaching its decisions on what its rules should be, and to provide, by rule, that situations not covered by other Senate rules are to be governed by Mason's, Robert's, the traditions of the Senate, or any other authority the Senate may desire. The Senate is also free, so long as everyone acquiesces, to proceed informally according to customary parliamentary practice or such of the above-mentioned authorities as may be convenient or as it pleases. But there are no binding rules about how many votes are needed to elect a President except as the Senate itself, directly or indirectly, makes them.

The Governor has no authority to determine the number of votes needed to elect a Senate President. His constitutional mandate to convene the Senate does not convey the power to control or direct it. When on past occasions, as the Senate was organizing itself, the Governor announced the number of votes required, his announcement was nothing more than a suggestion or proposal. It

was up to the Senate to accept, reject or modify his proposal. When the Governor's suggestion met no objection, it was in effect adopted by the Senate's unanimous, though silent, acquiescence. Similarly, if without any rule being stated an election were held and the winner of a plurality were declared elected and sworn in without objection, the Senate would thereby acquiesce in a rule that that vote was large enough. Each time a Senate President was elected from the adoption of the 1970 Constitution until this year, the Senate tacitly adopted the Governor's proposed rule.

The year 1981, however, was different. Senators Netsch and Rock objected to the Governor's announcement that a majority of those voting would suffice. At that point the number required became a matter the Senate itself had to decide before the election could proceed; for there were no rules until the Senate made them.

No rule on the subject was ever properly adopted by the present Senate. The closest approach was the Governor's announcement that Senator Netsch's objection would be treated as an appeal from the chair's ruling that a majority of those voting was sufficient. The vote taken after that announcement on the appeal from the Governor's ruling was ineffective, however, for two reasons.

First, an appeal from the ruling of the chair is not an acceptable equivalent of a positive vote on what the rule should be. The Senators were deciding the wrong issue. They should properly have been voting on what the rule *should be*, or on what they would like it to be. But the Governor treated his ruling as a declaration of what the existing rule *was*; and the vote on the appeal was probably seen as a judgment on that declaration. That vote did not adopt a rule.

Moreover, a vote to overturn the ruling of the chair is in the nature of a criticism of the occupant of the chair,

here the Governor. The Governor had considered the problem and had consulted with parliamentary experts; for a Senator to vote against him on such an apparently technical matter might be regarded as an insult. It is psychologically difficult and sometimes politically dangerous to do that to the head of one's State and party. If the vote had been taken in the proper form, on a regular motion to require a certain number of votes to elect the President, if everyone had understood that the Governor was only making a suggestion on a matter entirely within the Senate's choice, the Senators would have felt freer to vote their consciences.

A further problem with a vote in the form of an appeal is that had the vote been tied, that would have affirmed the chair's ruling, in effect giving the Governor a tie-breaking vote, which he should not have. The Governor is not a Senator; passing a rule should take an affirmative majority among Senators.

The second reason the vote on the appeal was ineffective is that, when it was taken, there was no quorum. My colleagues have demonstrated the factual and legal basis for this conclusion. The presence or absence of a quorum during the roll call vote for election of the Senate President is irrelevant to my conclusion regarding the infirmity of the vote on the appeal. However, their reasoning shows that no quorum was present during the vote on the appeal from the ruling of the chair, and I adopt it for that purpose. As my colleagues have adequately explained, when only 29 Senators answered to that roll call, any presumption that a previously existing quorum continued evaporated.

There is no reason to suppose any Democrats were on the floor during that roll call but not voting, and every reason to believe none were. When the Senate reconvened after its recess for caucuses, Senator Netsch announced that she saw no Democrats except herself and Senator

Rock, and that neither of them would be around for long. The intent of the Democratic Senators to break the quorum is obvious. Niether Senator Netsch's demand for a quorum roll call nor the Governor's tactic of stopping the roll call every time she left the floor and resuming when she returned makes any sense if Senator Rock and 29 Republicans were in the chamber at the time. It is even clearer that 30 Senators were not actually present because the petitioners deny they were and the respondents have never asserted that *in fact* 30 Senators were there.

In summary, a rule was required; none was adopted. The vote for President was therefore useless. It should not have been conducted until the Senate settled the rules that would govern it. Until then, no election could have a determinate outcome. For these reasons, Senator Shapiro was never President of the Senate.

At the time of our order, neither was Senator Rock. His election was conducted outside a regularly convened session of the Senate, at a gathering called together before the official scheduled time for the Senate to convene, and without notice to the Republican members. It appears that Senators were forcibly prevented from participating. In any event, they were effectively deprived of their rights as members. The Rock election on February 3, 1981, 6 days prior to our order, was a nullity.

Because the Senate did not yet have a President, we mandamused the Governor to convene it to elect one after deciding for itself, upon an appropriate motion, how many votes would be required. In other words, we told everybody to start over and do it right. I believe that was the proper result.

MR. JUSTICE UNDERWOOD, dissenting:

In addition to joining the dissents of Mr. Justice Ryan and Mr. Justice Moran, I am compelled to add the following comments, for it seems clear to me that petitioners'

motion for leave to file their petition for *mandamus* should not have been allowed. As the authorities cited by Mr. Justice Ryan indicate, intervention by this court in the internal affairs of the legislative branch of government can be justified only to redress a violation of the Constitution. There has been no violation of the Constitution here.

The motion for leave to file the original petition for *mandamus* alleged only that no member of the Senate had received the votes of a majority of the elected senators for the office of Senate President, and that the Governor "fails and continues to fail" to convene the Senate for the purpose of electing a President of the Senate; a writ of *mandamus* was requested as necessary for the purpose of directing the Governor to comply with the constitutional mandate that he convene the Senate to elect its President. The petition repeated these allegations but further revealed that the Governor had convened the Senate for that purpose on January 14, and declared Senator Shapiro the duly elected Senate President after he had received 29 votes—the votes of all those Senators voting on the question. The motion for leave to file and the petition plainly assert only a single alleged constitutional violation by the Governor: proclaiming as President a Senator who had not received the votes for that office of a majority of the elected Senators—30 votes. Consequently, only if the Constitution of this State requires 30 votes in order to elect a Senate President is there a violation of the Constitution and a basis upon which this court may intervene.

Four members of this court agree that there is no requirement of 30 votes contained in the Constitution. Since it is apparent that the only constitutional violation alleged by petitioners to have occurred did not occur, Mr. Justice Ryan, Mr. Justice Moran and I agree that the motion for leave to file should not have been allowed, and that the petition for *mandamus* should now be dismissed

as improvidently permitted to be filed. Mr. Justice Simon indicates he doubts our authority to mandamus the Governor (*People ex rel. Bruce v. Dunne* (1913), 258 Ill. 441) but avoids the problem on the basis that the Governor indicated his willingness to have us hear and decide the case. It is true that during oral argument of the case the Attorney General did indicate the Governor's willingness to abide by our decision on the merits of the matter. But agreeing to abide by our ruling on the petition for *mandamus* once we had decided to hear the case is not to be equated with agreeing that we should have allowed the motion for leave to file the petition in the first instance. That motion was vigorously opposed by the Governor, who specifically asserted in paragraph 6(C) of his objections, filed after we had requested a response, that:

> "The proposed Petition for Writ of Mandamus would require the Court to invade the province of the legislative branch and violate the constitutional separation of powers. [Const. Art. IV sec. 6(d); Art. III, sec. 1; *Reif v. Barrett*, 355 Ill. 104, 126 (1933)]."

In paragraph 6(D) the Governor also asserted:

> "The proposed petition for Writ of Mandamus would require the Court to invade the province of the Executive Branch also by telling the Governor how he must exercise his powers and discretion and thus violates the Constitutional separation of powers. *People ex rel. Bruce v. Dunne*, 258 Ill. 441, 456 (1913)."

Allowance of leave to file the petition cannot be justified on the grounds of the Governor's consent.

I find somewhat remarkable the process by which those of our colleagues who find a constitutional requirement of 30 votes to elect a Senate President have reached that conclusion. They concede the correctness of the general rule that, "[i]n the absence of a constitutional or statutory provision or rule of a legislative body to the contrary, it is universally accepted that the act of a majority of a quorum is the act of the body." (*Launtz v.*

*People ex rel. Sullivan* (1885), 113 Ill. 137, 142; Mason, Manual of Legislative Procedure for Legislative and Other Governmental Bodies sec. 510 (1979).) But, characterizing the election of a Senate President as of as great or greater importance than many other Senate actions for which a vote of more than a majority of a quorum is expressly required, my colleagues say it would "unthinkably" demean his status as a constitutional officer, and that it is "inconceivable" that the framers of the Constitution could have intended to permit election by less than a majority of the elected Senators. Given the fact that in nearly a score of other instances the constitutional framers expressly required an extraordinary majority before legislative action could be taken, it seems to me more nearly "unthinkable" and "inconceivable" that they could have inadvertently overlooked requiring an extraordinary majority here had they in fact so intended. 2A A. Sutherland, Statutes and Statutory Construction secs. 47.23, 47.24 (1973).

Petitioners gloss over the fact that rulings in earlier years on the question of whether election of a presiding officer required the votes of a majority of the members of the House or Senate have not been completely uniform. Usually that officer has been elected by the votes of a majority of the elected members—but not always. A Speaker of the House was elected under a majority-of-a-quorum rule as recently as 1973, and the Presidents Pro Tempore of the Senate have been elected in that manner with some frequency. Nor was the earlier ruling of the Governor in the election of the President of the Senate of a different General Assembly binding upon him here if he believed, as he obviously did, that his earlier ruling did not correctly interpret the Constitution's requirements.

To recapitulate: The only constitutional question presented by the motion for leave to file the petition for *mandamus* and the petition itself was whether the Constitution required 30 votes to elect a President of the Senate.

Clearly, in my opinion, it did not. At that point the doctrine of separation of powers dictated that our inquiry into the internal operations of the Senate terminate, for there had been no constitutional transgressions. The Constitution vests in each house of the legislative branch the power and responsibility to choose its own officers. In the absence of a constitutional violation during that process this court may not review what is a purely political process. *Davids v. Akers* (9th Cir. 1977), 549 F.2d 120; *Reif v. Barrett* (1933), 355 Ill. 104, 126.

I would dismiss the petition for a writ of *mandamus* as improvidently granted.

RYAN and MORAN, JJ., join in this dissent.

MR. JUSTICE RYAN, also dissenting:

Today's holding by this court does violence to established parlimentary rules relating to methods of determining the presence of a quorum in legislative bodies. The court's opinion considers the necessary inference to be drawn from *Auditor General v. Board of Supervisors* (1891), 89 Mich. 552, 51 N.W. 483, is that a recess destroys the presumption of the continued presence of a quorum. This inference is not supported by section 504(1) of Mason's Manual of Legislative Procedure For Legislative and Other Governmental Bodies (1979) (hereafter Mason's Manual), which is cited in the opinion. That section states:

> "When a body has convened with a quorum present, it can continue to transact business as long as a quorum is present and it is presumed that the quorum continues to be present until the question of no quorum is raised or the lack of a quorum is disclosed by a vote."

Of necessity, the presumption of a quorum must continue after a recess. A recess is a short intermission within a meeting which does not end the meeting or destroy its continuity, after which proceedings are resumed at the

point where they were interrupted. (H. Robert, Robert's Rules of Order sec. 8, at 71, sec. 20, at 196-97 (S. Robert ed. 1981) (hereafter Robert's Rules of Order).) At the conclusion of a recess and the resumption of business, there are no "opening proceedings." Business is immediately resumed where it left off, just as if there had been no recess. (Robert's Rules of Order sec. 8, at 73.) This is in contrast to an adjournment which terminates a meeting and after which a meeting begins with the procedure of opening a new meeting. (Mason's Manual sec. 214, at 184.) Thus, after a recess there is no occasion to again call the roll to determine the presence of a quorum. Following the recess in this case, the fact that only 29 voters voted on the appeal of the Governor's ruling concerning the number of votes necessary to elect the President of the Senate did not establish that a quorum was not present. The number of members voting does not establish the absence of a quorum. A quorum is determined by the number of members present, not the number voting. (Mason's Manual sec. 503(1), at 347.) Section 504(6) of Mason's Manual provides that when the question of no quorum is raised, the presiding officer may count the members, or he may assume the responsibility of declaring a quorum present or not present. Section 504(7) of Mason's Manual provides that the question of no quorum is decided by the presiding officer as any other point of order, and is subject to appeal in the same manner.

In this case, after the recess and after two requests by Senator Rock had been denied by the Chair, Senator Netsch suggested the absence of a quorum. The Governor, as the presiding officer, assumed the responsibility, as he had the authority to do, of declaring a quorum present without a roll call by stating: "The Chair observes a quorum is present." (Transcript of 82nd General Assembly Regular Session, at 18 (Jan. 15, 1981).) This ruling was

subject to an appeal as any other ruling by the Chair on a point of order. No appeal was taken from this ruling. The Governor, nonetheless, stated that if Senator Netsch desired, he could direct that a roll call be had on the question of a quorum and he then directed that the roll be called. While the roll was being called, Senator Netsch apparently left the floor, returned and left again. In any event, the Governor, as the presiding officer, stopped the roll call and ruled it was out of order because the mover on the question of a quorum had left the floor. Again, no appeal was taken from that ruling. Thus, when the call of the roll on the appeal from the Chair's ruling on the number of votes necessary to elect the President of the Senate was commenced, there had been a determination by the presiding officer, on the suggestion of no quorum, that a quorum was present, and that ruling was not appealed. Therefore, under accepted rules of parliamentary procedure, there had been a determination following the recess that a quorum was present, and there is nothing in the record to contradict this determination.

The plurality opinion states that a presiding officer's determination that a quorum is present is presumed correct only until challenged or until a vote discloses the absence of a quorum. In this case there was no appeal from the Governor's ruling that a quorum was present. Therefore, it appears that the opinion holds that since only 29 votes were cast on the question of the number of votes necessary to elect the President of the Senate, the presumption of the continuance of a quorum following the Governor's determination of a quorum was destroyed. I do not agree. Regardless of how the determination of a quorum is made following the raising of the question of no quorum, that question is decided by the presiding officer, whether it is by a call of the roll, or by a declaration by the presiding officer without a roll call. (Mason's Manual secs. 504(6), 504(7), at 350.) A quorum is deter-

mined by the number of members present, not the number voting. Those present and not voting cannot defeat a proposition by not participating, thereby hoping to establish that a quorum was not present. *Launtz v. People ex rel. Sullivan* (1885), 113 Ill. 137; Mason's Manual sec. 503(1), at 347.

Although I believe that after the recess there was a proper determination of the presence of a quorum and that the continued presence of a quorum must be presumed, we need not rely solely on that presumption. The transcript of the record clearly shows that the Governor's determination was correct. After the recess 29 members voted on the appeal of the Governor's ruling concerning the number of votes needed to elect the President of the Senate. In addition, after the recess, the transcript discloses that Senator Rock and Senator Netsch were both present on the floor of the Senate, and both members, during this presence, addressed the Chair. Senator Rock first requested debate on a motion to limit debate and then asked leave to amend the motion. Although the transcript discloses that Senator Netsch left the floor, there is no showing that Senator Rock did so. Nothing has been presented to this court that would show that Senator Rock was not present during the vote on the appeal from the Governor's ruling concerning the number of votes required to elect the President of the Senate or during the vote for the President of the Senate itself. Section 505(8), of Mason's Manual states that when the journal shows a quorum present it will be presumed that a quorum continues to be present unless the presumption is contradicted by the journal itself. There is nothing in this transcript that would contradict this presumption. We must therefore conlcude that a quorum of 30 Senators was present when the Senate voted on the appeal from the Governor's ruling. We must also conclude that at least 30 Senators were present at the election of the President

to the Senate. The fact that less than a quorum voted on the appeal from the Governor's ruling and for the election of the President of the Senate did not destroy the presence of a quorum.

In addition to the presumed presence of Senator Rock, during the vote for President of the Senate the Governor interrupted the roll call and stated: "The Chair notes the presence of Senator Savickas." (Transcript of 82nd General Assembly Regular Session, at 20 (Jan. 15, 1981).) Following the roll call, the Governor stated:

> "The Chair will again note that *** Senator Frank Savickas was present on the Floor of the Senate during the roll call." (Transcript of 82nd General Assembly Regular Session, at 21-22 (Jan. 15, 1981).)

The plurality opinion finds that the Governor had no authority to count nonvoting members in order to make up a quorum. The plurality finds support for its conclusion in the language of the North Carolina Supreme Court in *State ex rel. Stanford v. Ellington* (1895), 117 N.C. 158, 23 S.E. 250, which construed the holding of the United States Supreme Court in *United States v. Ballin* (1892), 144 U.S. 1, 36 L. Ed. 321, 12 S. Ct. 507. *Ballin* involved the question of the methods that could be used in determining the presence of a quorum. The court noted that the Constitution had prescribed no method for making such determination but concluded that the House of Representatives of Congress could adopt a rule providing the method of determining the presence of a quorum and found that Rule 15, which authorizes the Speaker to suggest the names of members present and not voting to be counted in determining the count, was permissible as not being contrary to any constitutional provision or any fundamental principle. I cannot find in *Ballin* the conclusion of this court and the North Carolina Supreme Court in *Ellington* that in the absence of such a rule the presiding officer has no authority to determine the presence

of a quorum in this manner. If it ever was the accepted practice to limit the presiding officer in this regard, it is a practice apparently no longer followed in legislative bodies. Mason's Manual states:

> "In Congress, on the demand of any member, or at the suggestion of the presiding officer, the names of members sufficient to make a quorum, who are in the house but who did not vote, may be noted by the clerk, recorded in the journal, and be reported to the presiding officer with the names of the members voting, to be counted and announced in determining the presence of a quorum. *This would seem to be a proper practice in any legislative body in case the presence of a quorum is disputed.*" (Emphasis added.) Mason's Manual sec. 503(5), at 348.

Although *Ellington* is cited in support of several other sections dealing with other questions in Mason's Manual (see sec. 500(2), at 341-42, sec. 504(2), at 349, sec. 510(1), at 355, sec. 532(4), at 385, sec. 532(5), at 385, sec. 535(9), at 390), it is not cited for the construction it has placed on the holding of the United States Supreme Court in *Ballin* referred to above. That construction is contrary to the appropriate procedure suggested in section 503(5), at page 348, of Mason's Manual quoted above.

In concluding its discussion on the quorum question, the plurality opinion states:

> "*Because the transcript fails to reflect the presence of a quorum,* we hold that the purported election of respondent Shapiro did not constitute compliance with the provision of article IV, section 6(b), that the Senate while convened, 'elect from its membership a President of the Senate as presiding officer.'" (Emphasis added.) (85 Ill. 2d at 427.)

The italicized language is not a correct statement. On the contrary, following the recess the transcript shows that 29 Senators, plus Senator Rock, were present, and nothing in

the transcript or anywhere else shows that a lesser number than that was present. I noted above that Mason's Manual, section 505(8), at page 352, provides that when the journal shows a quorum present, it is presumed that a quorum continues to be present unless the presumption is contradicted by the journal itself. Once the presence of a quorum had been determined, "[t]he fact that less than a quorum vote does not raise a presumption that no quorum is present, but a quorum is presumed to be present until the absence of a quorum is determined." Mason's Manual sec. 503(2), at 347.

My colleague Mr. Justice Simon agrees that the Constitution does not require 30 votes, a majority of those elected to the Senate, to elect its President. He finds, however, that the election of Senator Shapiro is invalid because the Senate never adopted a rule which provides that a majority of those members present and voting is sufficient to elect the President. It is true, as my colleague observes, that the Constitution is silent on this subject. Also, as my colleague observes, when the Senate was convened by the Governor there were no rules of that body in effect that provided the vote required to transact business. However, after the Senate was convened, business was transacted according to some set of accepted rules of parliamentary procedure. Candidates for President of the Senate were nominated, and their nominations were seconded. A motion was made to adjourn the Senate until February 10. The Governor recognized the motion as being in order, and the motion was seconded. Senator Rock moved to place the motion on the table. The Governor recognized this motion as being in order and not debatable and directed that the roll be called on the motion to table. On the roll call the motion to table carried. Senator Newhouse then moved adjournment until January 22. The Governor stated that the Parliamentarian had informed him that, there being no intervening business

since the previous motion to adjourn, the motion was out of order. A motion was then made to close the nominations, which carried by a voice vote. Senator Newhouse then again addressed the Chair and stated that since there had been intervening business, he renewed his motion to adjourn. The motion was seconded and defeated on a voice vote. The Governor then requested that the Secretary call the roll. Senator Carroll, addressing the Chair, suggested that according to Robert's Rules of Order, "under which we are operating," they could have a vote by a division of the House by standing, "which is allowed under Robert's" instead of having a roll call. Senator Newhouse withdrew his motion for a roll call. The Governor at that time announced his ruling that a majority of those present and voting was required to elect the President. Senator Netsch questioned the ruling. Following an explanation of his ruling, the Governor stated he would treat the inquiry concerning the ruling as an appeal and asked if there was a second. Senator Rock seconded the appeal and moved for a recess. After a brief discussion of the question, the Governor again referred to parliamentary procedure and stated the appeal was a debatable question and that the vote of the majority of those present and voting was required to overrule the ruling of the Chair. Following some discussion the Governor stated, "Senator Rock, the Chair is advised by the Parliamentarian *** that you are entitled to your request even in the middle of the appeal." (Transcript of 82nd General Assembly Regular Session, at 16 (Jan. 15, 1981).) The Governor then recessed the Senate.

Thus, although the Senate had no adopted rules governing its procedure, it plainly was operating under rules of parliamentary procedure, and it appears from the transcript that Robert's Rules of Order was being followed. It is not correct, as my colleague states, that the custom cannot supply "a body of rules for the Senate,

even temporarily." If that were true, in what manner will the Senate proceed in adopting the rules which my colleague finds necessary?

Our constitution provides that each house shall determine the rules of its proceedings and choose its officers. (Ill. Const. 1970, art. IV, sec. 6(d).) Therefore, the rules which the Senate follows and the method it elects to adopt in choosing its officers are purely legislative matters. The Constitution neither specifies nor prohibits any particular method of choosing the officers. It does not even provide that the officer shall be elected. Mason's Manual section 37(1), at page 61, provides: "All matters of procedure not governed by constitutional provisions, adopted rules, *** or an adopted manual, are governed by the rules of the general parliamentary law." Chapter 8 of Mason's Manual, page 66, sets out the principles of parliamentary law. Section 43(8), at page 68, provides that to make a decision the constitution or statute may require more than an affirmative vote of a majority of the legal votes cast, but that parliamentary law requires only a majority vote. This section refers to section 510, at page 355, which provides that a majority of the legal votes cast, a quorum being present, is sufficient to carry the proposition unless a larger vote is required by constitution, charter or controlling provisions of the law. Robert's Rules of Order section 1, at page 3, likewise provides that a majority vote of those present and voting on a particular matter in a meeting at which a quorum is present is sufficient, provided there is no requirement that a greater number is necessary. Thus, whether the Senate was operating under Robert's Rules of Order, as some of the members indicated in the transcript, or whether it was operating under the general principles of parliamentary law by virtue of its failure to adopt rules, it was not operating in a vacuum. There were established principles of procedure which applied to the Senate proceed-

ings which authorized the election of its officers by a vote of a majority of those present and voting.

My greatest concern is that this court has taken it upon itself to become involved in this question. The Constitution vests solely in each house of the General Assembly the authority to determine the rules of its proceedings and to choose its officers. (Ill. Const. 1970, art. IV, sec. 6(d).) As noted above, the Constitution does not even require that the officers be elected. Even if the Senate would have adopted specific rules governing the procedure for selection or election of its President, and if it would have failed to follow the rules adopted, this court would have no authority to intervene. This would also be true if the Senate, after having failed to adopt rules, and being governed by general principles of parliamentary law, had failed to comply with those procedures. Mason's Manual provides:

> "Under a constitutional provision declaring that each house of the legislature shall determine the rules of its own proceedings, the fact that a house acted *in violation of its own rules* or *in violation of parliamentary law* in a matter clearly within its power does not make its action subject to review by the courts." (Emphasis added.) Mason's Manual sec. 24(4), at 53.

The same section of the Constitution that provides that each house shall choose its officers also authorizes it to judge the qualifications of its members. In *Reif v. Barrett* (1933), 355 Ill. 104, 127, *overruled on other grounds in Thorpe v. Mahin* (1969), 43 Ill. 2d 36, 45, this court held that under a similar provision in our 1870 Constitution the final decision of the House of Representatives on that subject is conclusive and the court has no right to review its decision. In *Humphrey v. City of Youngstown* (Ohio App. 1955), 143 N.E.2d 321, the court held that a legislative act will not be declared invalid for noncompliance with the rules of that body. In *State v. Savings Bank* (1906), 79 Conn. 141, 152, 64 A. 5, 9,

the court stated that when the constitution gave the legislature the power to determine its own rules, if the legislature, acting in a matter clearly within its power, abused the power, the court should not intervene. "[I] t would be an unwarranted invasion of the independence of the legislative department for the court to set aside such an action as void \*\*\*." In *Goodwin v. State Board of Administration* (1925), 212 Ala. 453, 455, 102 So. 718, 719, the court held that the fact that the House overlooked or violated a rule not required by the Constitution in the passage of an act did not impair its validity. (See also *Schweizer v. Territory* (1897), 50 Okla. 1297, 47 P. 1094; *McDonald v. State* (1891), 80 Wis. 407, 50 N.W. 185; *Keenan v. Price* (1948), 68 Idaho 423, 195 P.2d 662.) In *State v. Cumberland Club* (1916), 136 Tenn. 84, 91-92, 188 S.W. 583, 585, the court stated, "The Senate has the right, under the constitution, to make its own rules \*\*\*, and it must be the judge of those rules. All the court can do is to ascertain whether the constitution has been complied with." In *State v. Lewis* the court, in considering a procedure followed by the legislature, stated:

> "The general statement of the rule is that the powers of the General Assembly are plenary as to all matters of legislation unless prohibited by some provision of the constitution." *State ex rel. Coleman v. Lewis* (1936), 181 S.C. 10, 24, 186 S.E. 625, 631.

Under this well-established authority, the choosing of the officers of the Senate being vested in that body by the Constitution, the power of the Senate to choose its officers is plenary, and the doctrine of separation of powers prohibits this court from doing anything other than ascertaining whether the provisions of the Constitution have been complied with. The only constitutional requirement applicable here is that a quorum of the majority of the members elected to the Senate must be present before

business can be transacted. (Ill. Const. 1970, art. IV, sec. 6(a).) I have considered that question above. Beyond that, this court has no authority to inquire into the proceedings of the Senate in selecting its President.

UNDERWOOD and MORAN, JJ., join in this dissent.

MR. JUSTICE MORAN, also dissenting:

In addition to joining the dissents of Mr. Justice Underwood and Mr. Justice Ryan, I submit the following reasons as to why *mandamus* is an inappropriate remedy in this case.

Article VI, section 4, of the Illinois Constitution of 1970 empowers this court to exercise original jurisdiction in cases relating to *mandamus.* The traditional use of the writ of *mandamus* has been to compel the officer to whom it is addressed to perform a ministerial duty which he has failed to perform. (*People ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. Clark* (1957), 12 Ill. 2d 515, 519; *People ex rel. Jacobi v. Nelson* (1931), 346 Ill. 247, 251.) However, the performance of such duty cannot involve the exercise of discretion or judgment. (*People ex rel. Ward v. Salter* (1963), 28 Ill. 2d 612, 615-16; *People ex rel. Dolan v. Dusher* (1952), 411 Ill. 535, 538.) Where the performance of an official duty or act involves the exercise of judgment or discretion, the officer's action is not subject to control by *mandamus. Chicago & North Western Transportation Co. v. Matoesian* (June 26, 1981), No. 54217; *South Chicago Community Hospital v. Industrial Com.* (1969), 44 Ill. 2d 119, 122; *People ex rel. Iasello v. McKinlay* (1951), 409 Ill. 120, 124.

Also, an original action for a writ of *mandamus* in this court will not lie where it appears that an unresolved question of fact is involved. In such action only issues of law are to be considered. *Touhy v. State Board of Elections* (1975), 62 Ill. 2d 303, 312; *People ex rel. Ward v.*

*Moran* (1973), 54 Ill. 2d 552, 557; *People ex rel. Jones v. Robinson* (1951), 409 Ill. 553, 555; *Monroe v. Collins* (1946), 393 Ill. 553, 557; 73 Ill. 2d 512.

In the instant case, discretion on the part of the Governor and unresolved questions of fact are present.

Section 6(b) of article IV of the Illinois Constitution confers upon the Governor the ministerial duty of convening the Senate "to elect from its membership a President of the Senate as presiding officer." The Governor performed this constitutional duty on January 15, 1981. In performance of this duty, it became necessary for him to make certain parliamentary rulings, since no established rules governing the number of votes necessary to elect a President had been previously established by members of the Senate. By his parliamentary rulings the Governor was performing discretionary acts, not a ministerial function. Consequently, the plurality's conclusion that *mandamus* is appropriate is clearly erroneous.

The plurality concedes that *mandamus* will not lie to direct the manner in which the discretion is to be exercised, but, relying on *People ex rel. Chesapeake & Ohio Ry. Co. v. Donovan* (1964), 30 Ill. 2d 178, 180, argues that "it is available to compel the performance of an action which requires the exercise of discretion or even to compel the exercise of discretion itself." (85 Ill. 2d at 416.) That case, however, supports denial of the writ in the situation that confronts us. In *Donovan,* a circuit court judge denied a motion to dismiss a complaint, holding that the doctrine of *forum non conveniens,* upon which the motion was based, was inapplicable. This court, after concluding that the judge applied a clearly erroneous rule of law, awarded a writ of *mandamus* requiring the judge to exercise his discretion in light of the applicable legal standards. In that case, however, the court did not tell the judge how to exercise his discretion. Rather, it simply ordered the judge to exercise his discretion in accordance

with a clearly enunciated rule of law. (30 Ill. 2d 178, 180-81.) Here, the *mandamus* is issued to direct the manner in which the discretion is to be exercised, the very circumstance in which the plurality acknowledged *mandamus* will not lie. 85 Ill. 2d at 416.

It is important to note that *Donovan,* in holding that *mandamus* is available to compel the exercise of discretion, relied upon *People ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. Clark* (1957), 12 Ill. 2d 515. That case involved a factual pattern similar to *Donovan.* The trial judge denied a motion to dismiss the case, holding the doctrine of *forum non conveniens* inapplicable. Movants sought a writ of *mandamus,* arguing that the judge failed to exercise his discretion. This court, after engaging in detailed analysis of exercise versus nonexercise of discretion, concluded that *mandamus* was inappropriate, even if discretion were not exercised in accordance with the correct rule of law. (See *Chicago & North Western Transportation Co. v. Matoesian* (1981), 85 Ill. 2d 404; *St. Louis-San Francisco Ry. Co. v. Gitchoff* (1977), 68 Ill. 2d 38, 47 (Dooley, J., concurring).) The court, in *Clark,* stated:

> "Where the performance of an official duty or act involves the exercise of judgment or discretion, the officer's action is not subject to review or control by *mandamus.* [Citation.] Although *mandamus* will lie to compel the performance of a judicial duty where such duty is ministerial and the right is clear, this court has repeatedly held that the writ will not lie to direct or modify the exercise of judicial discretion by a judge. [Citations.] ***
> ***
>
> *** Where an officer, in the exercise of a discretionary power, has considered and determined what his course of action is to be, he has exercised his discretion, and his action is not subject

to review or control by *mandamus.*" 12 Ill. 2d 515, 520-21.

Clearly, under *Clark* and the other cases cited, *mandamus* is inappropriate in the instant case inasmuch as the Governor was called upon to make a ruling, an exercise of discretion. Certainly, it cannot be said that he failed to exercise a clearly delineated duty. Further, like the situation in *Clark,* petitioners ask not that this court order the Governor to act, but that it mandate that he act in a particular way (*i.e.,* to preside over the Senate's election of a President and to require that such election be by a majority of the total elected membership). This, in itself, indicates that it is the action of the Governor in the exercise of his discretion to which petitioners object, not his refusal to convene the Senate to elect from its membership a President. See *People ex rel. Atchison, Topeka & Santa Fe Ry. Co. v. Clark* (1957), 12 Ill. 2d 515, 522.

Further, as can be seen from the plurality opinion and the dissent of Mr. Justice Ryan, an unresolved question of fact arose with regard to the number of Senators present on the floor at the time of the disputed roll call. Were there 29, 30 or 31 Senators present at the time of the roll call electing Senator Shapiro President of the Senate? The transcript of proceedings does not reveal the answer. The plurality concludes that, because only 29 Senators voted for Senator Shapiro and there were no votes for Senator Rock, only 29 Senators were present. While the transcript discloses that Senator Savickas was noted as being on the floor during the call it is silent as to the whereabouts of Senator Rock. In short, the petitioners are asking this court to surmise, presume or conjecture a basic factual setting. As earlier stated, *mandamus* is not the vehicle to accomplish such desired result.

Having determined that *mandamus* is not the appropriate remedy in this case, I believe the right of Senator

Shapiro to hold the office of President of the Senate must be contested in a *quo warranto* proceeding. The object of a writ of *quo warranto* "is, to call in question the defendant's title to the office or franchise claimed and exercised by him, because of some alleged defect therein, as for instance *** that the election itself was void or irregular." (*People ex rel. Koerner v. Ridgley* (1859), 21 Ill. 65, 66-67.) Early case law in Illinois firmly established that *mandamus* is not the proper method of contesting the election of any person to an office which he has assumed. (*People ex rel. Seegers v. Dunlap* (1910), 248 Ill. 154, 156; *Snowball v. People* (1893), 147 Ill. 260, 266; *People ex rel. Ewing v. Forquer* (1825), 1 Ill. 104, 111.) The writ of *quo warranto,* then, is clearly the only appropriate mode to challenge the right of an official to hold the office claimed. It is aimed at preventing a continued exercise of authority unlawfully asserted rather than to correct acts performed under that authority. (*Johnson v. Manhattan Ry. Co.* (1933), 289 U.S. 479, 502, 77 L. Ed. 1331, 1347, 53 S. Ct. 721, 729-30.) These principles have been codified in "An Act in relation to practice and procedure in cases of *Quo Warranto*" (Ill. Rev. Stat. 1979, ch. 112, par. 9 *et seq.*). Section 1 of the Act specifies:

> "A proceeding in *quo warranto* may be brought in case: (a) Any person shall usurp, intrude into, or unlawfully hold or execute any office *** created by authority of this State."

In the present case, the focus of the challenge is the right of Senator Shapiro to hold office. The underlying foundation of that challenge is the allegation that the election conducted by the Governor was void in that it contravened the mandate of the Constitution that such officer be elected from the membership of the Senate. If such election is found to be void, the claim of title to the office will be defeated. The case before us is definitely one which

requires use of a proceeding in *quo warranto.*

The constitutional grant of original jurisdiction to this court is expressly limited to cases relating to revenue, *mandamus,* prohibition or *habeas corpus.* (Ill. Const. 1970, art. 6, sec. 4.) We are without original jurisdiction to hear this cause. The present controversy is one that may be brought only by a writ of *quo warranto* in the circuit court. I, therefore, believe that allowing the motion for leave to file a petition for a writ of *mandamus* was improvidently granted, and the writ of *mandamus* should be denied.

UNDERWOOD and RYAN, JJ., join in this dissent.